UNITED STATES of America,
Plaintiff-Appellee,

v.

Stephen Roderick McRAE,
Defendant-Appellant.

No. 78–5152.

United States Court of Appeals,
Fifth Circuit.

April 23, 1979.

Rehearing and Rehearing En Banc
Denied May 24, 1979.

Lucien B. Campbell, Federal Public Defender, C. Larry Mathews, Jr., Asst. Public Defender, El Paso, Tex., for defendant-appellant.

Jamie C. Boyd, U. S. Atty., LeRoy M. Jahn, F. G. Rodriguez, James E. Bock, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before INGRAHAM, GEE and FAY, Circuit Judges.

GEE, Circuit Judge:

About two years ago, appellant McRae killed his wife Nancy by shooting her through the head with his deer rifle at point-blank range. That he did so is admitted; his sole defense at trial was that the shooting was not malicious but accidental. The offense having occurred on the Fort Bliss military reservation, McRae was indicted for second-degree murder under 18 U.S.C. § 1111. A jury trial resulted in his conviction and sentence to life imprisonment. His appeal asserts numerous and

disparate errors; and we commence with a summary review of the evidence, restating facts necessary to our consideration of each point as we treat it. Though the case is difficult in some aspects—and in one very disturbing—we affirm.

### Facts

McRae was a military policeman on active duty at the time of the murder. He and his wife were on strained terms, in part because of his belief that she had been guilty of various types of misconduct during his absence on an overseas tour of duty. At numerous times during the last year of her life, he admittedly made statements to various witnesses out of her presence that he meant to kill her. Some of these may be viewed as mere jests in atrocious taste, but there was evidence, which the jury could have believed, that some were seriously and soberly made. Specifically, viewed in the light most favorable to the guilty verdict, the evidence established that on at least one occasion he threatened to blow her brains out with the very rifle with which he later did so.[1] At another time he stated that he had talked to a lawyer about killing her and that he could "beat it." On several occasions he vilified her in street language and stated that he would have to kill her because he did not want her rearing their children.

On the day of Mrs. McRae's death, she and McRae had agreed that he would move into barracks for a few days in consequence of their strained relationship. Late in the afternoon he came home to move out but, finding friends visiting, decided to return later. As he went to his automobile, Mrs. McRae followed. There they had harsh words before he drove away to barracks, McRae warning her to be gone when he returned. He remained there about an hour, drank beer, and made further angry threats to kill her. He then returned home

to find a cold dinner and a scolding wife. Sending the children into the bathroom, he took down the rifle from its rack in the living room. He then procured a round of ammunition from the bedroom and returned to the living room, where his wife was sitting in a chair. While talking to her he loaded the gun and worked its action, chambering the round. With the gun thus cocked and loaded, he started toward his wife in response, he testified, to her invitation to approach her. As he came on, the gun discharged, shattering Mrs. McRae's skull and killing her instantly.[2]

McRae then ejected the spent cartridge, pocketed it, and drove with his gun to a neighbor's home two doors down, leaving his children in the bathroom. To the neighbors he appeared severely agitated, stated that his wife was "not all right" and that he "had to do it," and asked the woman of the house to see to his children. He then drove to barracks and accosted a fellow M.P., stating that he had just killed his wife and suggesting that they have a beer. At no time did he examine his stricken wife or seek to aid her in any way. His explanation was that she was manifestly dead and that he did not wish to touch her. As to this, the photographs in evidence amply bear him out. McRae was later arrested without incident, tried, and found guilty of murder with malice by a jury.

### Complaints About the Jury Charge

Of the three that McRae makes, one is serious. Among the instructions that the court gave the jury appears a variation on the *Mann*[3] charge, a type of instruction with which for fourteen years this court conducted an inconclusive and frustrating engagement. These campaigns are detailed in our en banc opinion in *United States v. Chiantese,* 560 F.2d 1244 (5th Cir. 1977), and there is no need to reiterate them at length here. Suffice it to say that the classic

---

1. McRae denied making either this or the threat next discussed in text.

2. McRae's theory was that he loaded the gun for his wife's protection during his planned absence.

3. *Mann v. United States,* 319 F.2d 404 (5th Cir. 1963).

*Mann* instruction was one intended to guide the jury in its deliberations on criminal intent, the sole contested issue in this case. It contained two elements, the first innocuous and the second doubtful, sometimes—depending on its phrasing and that of the remainder of the charge—reversible.

The innocuous element is advice to the jury that they may infer intent from the defendant's knowing conduct, often accompanied by some such observation as that since one cannot look into the human mind, what one intends must usually be deduced from what he does.

The second, dubious element is injected "when words are changed or added which shift the prosecution's burden of proof and when . . . the defendant's act is equally susceptible of innocent motive and guilty purpose." *Chiantese, id.* at 1245. *Mann* itself was a tax case involving the omission of cash items from income by a physician: mistakenly, according to him; deliberately, according to the government. The charge there held to constitute reversible error ran: (First element) " 'It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted.' " (Second element) " '*So unless the contrary appears from the evidence*, the jury may draw the inference . . . .' " 560 F.2d at 1246, emphasis added. We held that the *giving of the second element of this instruction, so phrased, shifted the burden of proof to the defendant*, requiring him to prove a lack of intent. Other cases, however, often refused to reverse for the giving of a *Mann*-type instruction where other portions of the charge made plain that the burden was and remained on the government to prove the requisite specific intent, *e. g., Windisch v. United States,* 295 F.2d 531 (5th Cir. 1961) (pre-*Mann* ); where the charge emphasized elsewhere the presumption of innocence, *Estes v. United States,* 335 F.2d 609 (5th Cir. 1964), *cert. denied,* 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965); where the actions of the defendant were less ambiguous than in *Mann, Helms v. United States,* 340 F.2d 15 (5th Cir. 1964), *cert. denied,* 382 U.S. 814, 86

S.Ct. 33, 15 L.Ed.2d 62 (1965) (exact *Mann* language, but defendant kept double books and fabricated false cash tickets), etc. Countless distinguishments and variations followed, with disparate results, as our trial courts—doubtless abetted by the presence of the precise *Mann* language in a well-known and generally available form book—continued to use variations of the charge, and we continued to fuss, distinguish, and (often) affirm.

This history is carefully detailed in *United States v. Chiantese,* 560 F.2d 1244 (5th Cir. 1977) (en banc). There we closed the books on *Mann,* directing in the exercise of our supervisory powers that no further charges incorporating any version of *Mann's* second element—anything reasonably subject to interpretation as "shifting the burden to the accused to produce proof of innocence"—be given. 560 F.2d at 1255. We added as well that we would not, in the event that such were used, attempt to salvage the charge by reference to other portions of it. We also declared, however, that should such an instruction be given we would weigh the harm to the accused as a judicial matter, rather than reverse out of hand. *Chiantese* does not strictly apply to this case, which was tried at the very end of its 90-day grace period, but we are not forbidden to be guided by its wisdom. It is, moreover, at least as favorable to the accused as earlier available authorities upon which we might base our reasoning and result here.

We commence our examination of McRae's charge with a recognition that the essential vice of the *Mann* instruction is its arguable effect to "place a burden upon the defendant to produce evidence to overcome a presumption of guilt." *United States v. Wilkinson,* 460 F.2d 725, 733 (5th Cir. 1972). The pertinent portion of the charge here reads:

"Malice aforethought" means an intent, at the time of a killing, willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard to the consequences of human

life, but malice aforethought does not necessarily imply any ill will, spite or hatred towards the individual killed.

"Malice" as the term is used here, is but another name for a certain state or condition of a person's mind or heart. Since no one can look into the heart or mind of another, the only means of determining whether or not malice existed at the time of a killing is by inference drawn from the surrounding facts and circumstances as shown by the evidence in the case.

Now, in determining whether the decedent, Nancy E. McRae, was unlawfully killed with malice aforethought, the jury should consider all the facts and circumstances preceding, surrounding and following the killing as shown by the evidence in the case which tend to shed light upon the condition of mind and heart of Stephen Roderick McRae before and at the time of the deed. No fact, no matter how small, no circumstance, no matter how trivial, which bears upon the question of malice aforethought, should escape careful consideration by the jury.

An act is done knowingly if done voluntarily and intentionally and not because of mistake or accident or other innocent reason.

The purpose of adding the word "knowingly" is to ensure that no one will be convicted for an act done because of a mistake or because of an accident or other innocent reasons.

As stated before with respect to an offense of second degree murder such as is charged in this case, specific intent must be proved beyond a reasonable doubt before there can be a conviction.

By the term "accidental" or an "accident" is meant an event which takes place without one's foresight or expectation, an undesigned, sudden and unexpected event.

Now, if it is shown that the defendant, Stephen Roderick McRae, used a deadly weapon in the commission of the death of the deceased, Nancy E. McRae, then you may find, from the use of such weapon, *in the absence of explanatory or mitigating circumstances*, the existence of malice which is an essential element of the offense charged in the indictment. You are not obligated so to find, however. You may not find the defendant, Stephen Roderick McRae, guilty of second degree murder unless you are satisfied that the Government has established every essential element of the offense as explained in this charge beyond a reasonable doubt.

A gun, as a matter of law, is a deadly weapon.

Now, the essential elements of the crime of murder in the second degree, each of which the Government must prove beyond a reasonable doubt before you would be justified in finding the defendant, Stephen Roderick McRae, guilty of such offense are as follows:

(1) That the defendant, Stephen Roderick McRae, killed the decedent, Nancy E. McRae, unlawfully and without justification;

(2) That such killing was done by the defendant with malice aforethought;

(3) That in killing the decedent, the defendant was not acting in self-defense, nor was his action accidental.

As stated before, the burden is always upon the Government to prove beyond a reasonable doubt every essential element of the crime charged. Again, I remind you that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence whatsoever.

Now, if the Government has established each and all of the essential elements contained in the indictment beyond a reasonable doubt, you should find the defendant guilty as stated in the indictment.

(emphasis added).

It must be admitted at the outset that the form of the sentence in which the emphasized matter appears bears something of a structural resemblance to *Mann*. Entirely absent, however, is the first element of a *Mann* charge: an introductory instruction that one is "presumed" or may be "reason-

ably inferred" to have intended the natural and probable consequences of his knowing acts. To be sure, we have held some forms of such an instruction permissible standing alone. But the essential vice of *Mann* occurs only when both occur in conjunction, when the jury are advised, first, that the law presumes[4] one intends the natural[5] consequences of his knowing acts, qualified by (second) the notion that this is so unless the contrary is shown. In combination, these inform the jury that in such circumstances the law expects them to find malicious intent unless something in the evidence convinces them otherwise.

The instruction in this case does not do this. Rather than tell the jury that the law expects or suggests an inference of malice "unless the contrary appears from the evidence," it advises them that in the absence of explanatory or mitigating circumstances they may infer malice from the use of the gun but that they need not do so. Immediately thereafter and as part of the same paragraph follows the admonition that every essential element of the offense must be established beyond reasonable doubt before guilt can be found. We do not think that the above places any burden on the defendant to produce evidence or lays down any presumption or suggested inference whatever. Indeed, fairly read, it squarely advises the jury that even in the absence of explanatory or mitigating circumstances they *need not* infer malice from the use of the gun.

■ Appellant's next complaint about the charge is that in charging on the lesser included offense of voluntary manslaughter the court did not give proper emphasis to one of its aspects, that of "sudden quarrel." Voluntary manslaughter is defined in 18 U.S.C. § 1112 as the unlawful killing of a human being without malice, upon a sudden quarrel or heat of passion. Although the court actually read the statute to the jury at the commencement of its charge on lesser-included offenses, later on it omitted the "sudden quarrel" language in defining the

elements of proof. For several reasons, we conclude that the language used in these definitions was not prejudicially erroneous.

In the first place, it may be doubted whether the two aspects of voluntary manslaughter under 18 U.S.C. § 1112 are so discrete as appellant would have it. The phrase "sudden quarrel" is probably the direct descendant of the "sudden affray" element of the common-law offense. There it was understood to refer to a mortal combat by mutual agreement, 40 C.J.S. *Homicide* § 43 (1944), and nothing of that sort is suggested here. In its literal, nonhistorical meaning, it is surely not the quarrel that signifies but the heat of passion that it occasions. Manifestly, a mere feigned quarrel, without passion, would be no excuse whatever.

Authorities discussing section 1112 are meager, but at least one has defined the offense it denounces—in a case involving a drunken, interspousal knife fight over infidelity—as "an unlawful, intentional killing committed without malice aforethought, while in a sudden heat of passion due to adequate provocation." *Wakaksan v. United States*, 367 F.2d 639 (8th Cir. 1966), *cert. denied*, 386 U.S. 994, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967). In the circumstances of this case, we think the court's emphasis on heat of passion caused by adequate provocation justified. This is especially so since there was no evidence of any sudden quarrel and certainly none provoked by more than mere words—an inadequate provocation, as the court correctly charged. McRae, the only living witness to the shooting, testified that he and his wife were both laughing at the time. We do not think, on such evidence, that the court's failure to re-emphasize "sudden quarrel on adequate provocation" prejudiced McRae.

■ Finally, appellant objects to inclusion in the court's charge of a definition of first-degree murder. The court read to the jury section 1111 of Title 18, which defines

---

**4.** Or that "the presumption is," or even that "the inference is reasonable."

**5.** Or "probable," or "natural and probable."

first-degree murder and concludes, "Any other murder is murder in the second degree." He then stated that McRae was charged with murder in the *second* degree and proceeded to define and explain that offense. We see no prejudice here.

## Other Claims of Error

█ Of these the most troubling is one of the two complaints about prosecutorial excesses in closing arguments. The first of these was a mere expression, obviously grounded in the evidence, of personal belief by one prosecutor that by his threats McRae really meant to kill his wife as he said he would. It was accompanied by numerous references to the evidence and was followed, after an objection, by an instruction to disregard. If this was more than a permissible statement about what the prosecutor believed the evidence had established,[6] it was very little more. It was entirely free of the worst vice sometimes present in such statements, an implication that the prosecutor's belief rests on matter available to him but not to the jury. *See United States v. Dawson*, 486 F.2d 1326, 1330 (5th Cir. 1973). This passing comment, if error, was clearly not reversible.

Of an entirely different character, however, is the comment of the other prosecutor, Mr. James Bock, made at the outset of the final argument in the case:

I think the case is very simple. It boils down to whether or not, when the gun was fired, it was fired with the malice aforethought that the Government claims, or it was a total accident that Mr. Larry Mathews claims, and that this defendant, remember, testified, claimed. And remembering that credibility, ladies and gentlemen, remember that you don't have to believe a word of what he told you if you don't want to. You don't have to believe part of it if you don't want to. Or if you want to, you can believe all of it and turn him loose, and *we'll send him down in the elevator with you with his gun. He'll go out the front door with you.*

(emphasis added). The immediate objection of the defense to this statement was overruled. No motion for mistrial followed.

We are appalled at the Assistant United States Attorney's indulging himself in such an outburst as the italicized matter represents. Its addition to an otherwise proper argument could have been calculated to serve no purpose but intimidating the jury by threatening to, in effect, lock them up with McRae and his weapon, a weapon with which he had admittedly killed his own wife in the exercise—at the very least—of the most reckless and ludicrous carelessness. By these few, intemperate remarks, Mr. Bock placed in jeopardy the entire, tedious prosecution and risked its being set at naught by the stroke of a pen, the pen with which these words are written. They are the less excusable because they appear to be such a clear instance of overkill, having been made in a case where the evidence was crushing and the sole theory available to the defense, though manfully pressed, bordered on the incredible. *See Cronnon v. State of Alabama*, 587 F.2d 246, 252 (5th Cir. 1979) (Rubin, J., specially concurring). Thus we are unnecessarily called on to determine whether the entire proceeding must be set aside because of one redundant sentence and half of another.

█ It is settled that such remarks as these are to be viewed in the context of the entire record. We so observed in *United States v. Juarez*, 566 F.2d 511 (5th Cir. 1978), another case arising in the Western District of Texas, where for the third time we disapproved the use of the expression, " 'It will be your verdict. I wish it was mine.' " So viewed, though we severely disapprove of them, we do not believe they constitute reversible error in this particular case.

In the first place, the cause is scarcely a close one on its facts. The evidence against McRae was overwhelming: it is no denigration of the valiant efforts of the Federal Public Defender on behalf of his client to say that, in view of its weight and the

---

**6.** *See United States v. Morris*, 568 F.2d 396, 402 (5th Cir. 1978).

atrocious nature of the crime, an acquittal by any jury is almost impossible to envision. Second, the remarks are merely inflammatory. By this we mean that, unfortunate as they are, they are not of the most dangerous types: references to extra-record evidence, expressions of personal belief in guilt, or witness bolstering. Nor were they repeated. They occurred only once, early in the argument; and the remainder of the prosecutor's remarks were, if vigorous, not improper. Even one skunk thrown in the jury box is too many, but at least we do not face here such an unrelieved shower of them as occurred in, say, *Houston v. Estelle,* 569 F.2d 372 (5th Cir. 1978). Finally, the argument is merely an overblown version of an obvious truth; it cannot be the jury did not know that McRae would go free with his own property if they acquitted him. Jury trials for murder are not church picnics, and where an argument involves no more than hot gospelling, it is less likely to constitute reversible error than the more substantively pernicious forms referred to above. See our discussion of these in *United States v. Morris,* 568 F.2d 396 (5th Cir. 1978).

None of the above, however, is to be taken as approval of these remarks. The weight of evidence in this case approaches the unique, and were it only a little less we might be forced to reverse. We do not expect to see them again.

The remaining two claimed errors involve evidentiary rulings by the district court. As to rulings of this sort, it is a commonplace that the trial court enjoys a wide discretion, one which we do not disturb except for abuse.

The first of these complaints is of the admission of various photographs of the deceased and of the death scene. It is said that these should have been excluded under Rule 403, Federal Rules of Evidence, as relevant matter the probative value of which is substantially outweighed by the danger of unfair prejudice. Two of these color prints are indeed—as the trial court characterized them—gross, distasteful and disturbing. Exhibit 29 is a view of Mrs. McRae's corpse, clothed in her bloody garments, bent forward so as to display an exit wound in the back of her skull produced by part of McRae's dum-dum bullet, which exploded in her brain. Exhibit 22 shows a front view of her body, seated in the chair where she died, her left eye disfigured by the bullet's entry and her head broken by its force. By comparison with these, the other photographs are mild; but these are not pretty even to the hardened eye. Neither, however, was the crime, and these exhibits are not flagrantly or deliberately gruesome depictions of it. *See United States v. Kaiser,* 545 F.2d 467, 496 (5th Cir. 1977). The trial court carefully reviewed the government's photographic exhibits, excluding some of little probative value.[7] It found those admitted important to establishing elements of the offense—such as Mrs. McRae's position and that of the rifle when it was fired, as bearing on McRae's defense of accident.

■ Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. As to such, Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance. It is not designed to permit the court to "even out" the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none. Here was no parade of horrors. We refuse to interfere with the trial court's exercise of its discretion.

■ Finally, McRae complains of the admission, on rebuttal, of evidence about his intimate relations with certain women.

---

7. Such as the children's handprints in blood on the wall of their home.

The first of these commenced two months after his wife's death. We have carefully reviewed McRae's own testimony, which dwelt on his grief and his intense devotion to his wife and family, all in an attempt to cast Mrs. McRae's death as accidental. We note that he introduced medical testimony of his hospitalization during a two-week period following the murder for "grief syndrome." We note also that the trial court excluded some of the more prejudicial portions of the proffered rebuttal testimony, such as that recounting a particularly gross expression of contempt by him for his dead wife. In view of his emphasis on his desolation at her death and on his undying devotion, we cannot say that an abuse of discretion occurred in the admission of this rebuttal evidence.

McRae's conviction is therefore

AFFIRMED.