**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Terrence Carey NARANJO,**
**Defendant-Appellant.**

**No. 82–1452.**

United States Court of Appeals,
Tenth Circuit.

July 5, 1983.

Robert Gay Guthrie, Asst. U.S. Atty., and Robert N. Miller, U.S. Atty., Denver, Colo., with him on brief, for plaintiff-appellee.

Vicki Mandell-King, Asst. Federal Public Defender, and Michael G. Katz, Federal Public Defender, Denver, Colo., with her on brief, for defendant-appellant.

Before DOYLE and McKAY, Circuit Judges, and BROWN *, Senior District Judge.

WESLEY E. BROWN, Senior District Judge.

Defendant was charged with and convicted by a jury of second-degree murder, from which conviction he has taken this appeal. On December 19, 1981, defendant Terrence Naranjo, a member of the Southern Ute Indian Tribe, and Alice Baker Naranjo, a member of the Ute Mountain Ute Indian Tribe, lived in a house on the Southern Ute Reservation near Ignacio, Colorado. De-

fendant and Alice Naranjo had been divorced in May, 1980, but were living together in December, 1981 and were planning to be remarried on December 22, 1981. Three children lived with them: thirteen-year old Doreen, Alice's natural daughter, whom defendant had adopted; four-year old Joseph, and three-year old Linay, both the natural children of defendant and Alice Naranjo.

At about 3:00 o'clock in the afternoon on December 19, 1981, defendant and Alice went to Durango, Colorado to do some Christmas shopping. They returned home at approximately 10:00 o'clock that night, but stayed in the car for some time because defendant was drunk and they were arguing. Defendant honked the car horn, and Doreen went out to the car to carry in some packages. When defendant and Alice did come in the house, they were still arguing. Alice went into the bedroom she and defendant shared, and defendant told Doreen to put the younger two children to bed, and to go to bed herself.

The accounts of the only two witnesses at trial who were present in the house at the time of the fatal shooting, that is defendant and Doreen, begin to vary at this point. Doreen testified that after she went to bed, she got up and went to her bedroom door, where she saw defendant standing in the living room. As she watched, defendant reached in a paper sack, took out a bullet, and loaded his .44 caliber magnum revolver. When defendant began to walk around, Doreen became frightened and went back to bed. After lying in bed for some time, Doreen fell asleep. She was awakened by the sound of a gunshot and went to her parents' bedroom. There she found her mother lying on the bed, and defendant standing at the end of the bed with the gun in his hand. Doreen asked defendant what he had done, and defendant replied he had shot her mother. Defendant told Doreen to get Joseph and Linay up and dressed, so

* Hon. Wesley E. Brown, Senior District Judge for the District of Kansas, is sitting by designation.

they could drive to Bayfield, Colorado to call for help. Halfway there, defendant turned around and went back to the house. Eventually, defendant took the three children to the home of his mother and stepfather, told Doreen to call the police and tell them he had killed her mother, and turned himself in to the Durango Police Department.

Defendant testified that when they came in the house that night, Alice went immediately to their bedroom and lay down. He continued to argue, and told Alice that he was leaving and was taking the children with him. He awakened Doreen and had her get the other two children ready while Alice packed his bags. Defendant then got his gun out of the dresser in the bedroom used by him and Alice, and he and the children left in the car. After driving about as far as Bayfield, defendant decided there was no sense in leaving, turned around and drove back home. He picked up the gun and entered the house, upset at having left and still angry at Alice. The door to their bedroom was closed, and as he walked across the living room to the bedroom to put the gun away, he stumbled over the couch, and fell forward through the door. At some point between the time he fell, hit the floor, and got up, the gun went off accidentally, fatally wounding Alice in the face. Defendant did not remember cocking the gun or pulling the trigger, and stated he did not load it on the day of the shooting.

█ As the first issue raised in this appeal, defendant asserts that the district court erred in allowing the government to introduce evidence of defendant's prior batteries of Alice Naranjo. The evidence in question consisted of defendant's admission on cross-examination of beatings from 1977 through September, 1981, and two photographs of Alice's injured face, Exhibits 30 and 31, taken by a police officer the same day of the September, 1981 fight. Rule 404(b) of the Federal Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In *United States v. Tisdale,* 647 F.2d 91, at 93, cert. denied 454 U.S. 817, 102 S.Ct. 95, 70 L.Ed.2d 86 (1981), this Court stated:

We have commented before on the changes brought about by Rule 404 of the Federal Rules of Evidence, and noted the change from the starting position of exclusion "unless" to admission "unless." This is a significant change and is important in the examination of cases decided before the change in the Rules. The defendants have not demonstrated that any "unless" element is present to overcome the "admission."

Thus, Rule 404(b) is not exclusionary, and allows admission of uncharged wrongs unless they are introduced solely to prove a defendant's criminal disposition. *United States v. Nolan,* 551 F.2d 266, at 271 (10 Cir.), cert. denied 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977).

█ The evidence of defendant's previous batteries of the victim became admissible when defendant took the stand and testified that the shooting was accidental and thus done without the requisite criminal intent. The evidence, in the form of contemporaneous photographs and defendant's own admissions in response to the government's questions, was relevant, clear, and convincing in rebutting the asserted defense of accident. Also, there is a similarity and connection in this case between the prior acts and the crime charged, which is sufficient to allow admission of the evidence in question. The prior batteries and the charged killing of Alice Naranjo have in common their violent nature and the victim. We are not persuaded by defendant's reasoning that, because a gun was used in this instance and defendant had not used a

weapon other than his fists in preceding attacks, the prior acts are too dissimilar to be admissible. The continuing pattern of defendant's physical abuse of Alice occurred from 1977 to September, 1981, that is, just three months before the charged killing. We believe that such evidence was directly probative of the intent required to be proved beyond a reasonable doubt before defendant could be convicted on the charge of second-degree murder.

Defendant relies heavily on *United States v. Burkhart,* 458 F.2d 201 (10 Cir.1972). However, we find that case distinguishable. In *Burkhart,* the Court held there was no similarity or connection between the separate Dyer Act violations involved. Here, in contrast, the earlier beatings were plainly connected to the crime charged, as just explained. In *United States v. Tsinnijinnie,* 601 F.2d 1035, at 1040 (9 Cir.1979), cert. denied 445 U.S. 966, 100 S.Ct. 1657, 64 L.Ed.2d 242 (1980), that the Court held that "... there was no error in admitting evidence that three weeks before the death the victim and Tsinnijinnie had had a fight at a squaw dance. * * * Since the charge was second degree murder and the defense was that the killing was accidental, the evidence of the prior altercation was relevant and admissible as bearing on intent." The Fifth Circuit, in *United States v. Colvin,* 614 F.2d 44, cert. denied 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 802 (1980), stated at 45:

> Evidence of prior injuries showing a "pattern of abuse" was (properly) admitted to prove the malice aforethought required to support a conviction for second degree murder. The evidence was concededly critical in establishing intent.

The same result was reached by our own Circuit in *United States v. Harris,* 661 F.2d 138, at 142 (1981), where it was pointed out that "(t)he admissibility of evidence of other crimes, wrongs, or acts to establish intent and an absence of mistake or accident is well established, particularly in child abuse cases." While such extrinsic evidence may be especially necessary in child abuse cases such as *Colvin* and *Harris* due to the youth of the victims, we think such cases also support admission of the evidence of a pattern of abuse upon the adult victim here. That pattern of abuse is no less probative of intent or absence of accident in the case before us, though the victim was older.

■ Of course, even if relevant, evidence may be excluded if the danger of unfair prejudice arising from its admission is substantially greater than its tendency to prove a disputed issue. Rule 403, F.R.E. Striking that balance is a matter within the discretion of the district court. *Harris,* supra. We hold that the district court did not abuse its discretion in this case by concluding that the probative value of the evidence of earlier beatings was not outweighed by a danger of unfair prejudice.

■ Defendant's second point in this appeal charges error in the admission of Exhibit 11, a color photograph of the victim's head and torso as she appeared when investigators first appeared on the scene. The photograph depicts the position of the victim on the bed, the entry wound at the right upper lip, and a great deal of blood on the pillow, bedsheets, and the victim's face. Vincent Grove, one of the first persons to arrive after the shooting, testified that Exhibit 11 was an accurate representation of the body as it appeared to him when he entered the bedroom. The photograph was also used in connection with the pathologist's identification of the deceased, his testimony concerning the autopsy he performed, and his findings as to the manner in which the wound caused death.

■ The photograph is of course disturbing, as would be expected in any case in which the victim was shot in the face. But gruesomeness alone does not make photographs inadmissible. *United States v. Hoog,* 504 F.2d 45, at 50 (8 Cir.1974), cert. denied 420 U.S. 961, 95 S.Ct. 1349, 43 L.Ed.2d 437 (1975). Exhibit 11 went to the corpus delicti, and was taken with many other photographs showing the particulars of the crime scene. In our court system, juries are entrusted with the weighty obligation to find the facts in criminal cases of grave importance, such as the one before us. We think it is incompatible with that

degree of trust to attempt to "protect" them from the evidence questioned here. It was part of the surroundings of the scene of the crime. The photograph was not unduly nor designedly inflammatory. For this reason we believe the jury was not improperly prejudiced by it, particularly when they were instructed that prejudice was not to influence their verdict. *United States v. McRae*, 593 F.2d 700 (5 Cir.) cert. denied 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979), was a similar case in which the photographic evidence found admissible was more gruesome than Exhibit 11 in the case at bar. We find the following language from that well-reasoned opinion applies with particular force here:

> Exhibit 29 is a view of Mrs. McRae's corpse, clothed in her bloody garments, bent forward so as to display an exit wound in the back of her skull produced by part of McRae's dum-dum bullet, which exploded in her brain. Exhibit 22 shows a front view of her body, seated in the chair where she died, her left eye disfigured by the bullet's entry and her head broken by its force. By comparison with these, the other photographs are mild; but these are not pretty even to the hardened eye. Neither, however, was the crime, and these exhibits are not flagrantly or deliberately gruesome depictions of it. (Citation omitted). The trial court carefully reviewed the government's photographic exhibits, excluding some of little probative value. (Footnote omitted). It found those admitted important to establishing elements of the offense—such as Mrs. McRae's position and that of the rifle when it was fired, as bearing on McRae's defense of accident.
>
> Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. As to such, Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance. It is not designed to permit the court to "even out" the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none. Here was no parade of horrors. We refuse to interfere with the trial court's exercise of its discretion. (Emphasis in original.)

*McRae,* supra, 593 F.2d at 707. We cannot see that the photograph showing the site of entry of the fatal bullet in this case had any less bearing on the defense of accident than the photographs allowed in *McRae.* It was probative to some extent of what occurred. Likewise, Exhibit 11 was not "flagrantly or deliberately" grisly or hideous, and it was not introduced solely for what prejudicial effect it could produce. Perhaps most importantly, its admission was simply not unfair. We find no abuse of discretion by the district court in admitting Exhibit 11.

Defendant also contends that Exhibits 30 and 31, discussed earlier, showing Alice Naranjo's severely cut and swollen nose, were inadmissible as inflammatory. These photographs, we have held, were proper evidence of prior acts, and they are in no sense so shocking as to have unfairly prejudiced the defendant.

Finally, defendant asserts that the evidence was insufficient to support his conviction, claiming particularly that the government did not prove beyond a reasonable doubt that the shooting was not accidental. Looking at the evidence with a view to supporting the conviction, the following synopsis emerges. Defendant had on several previous occasions intentionally battered the victim in drunken anger. On December 19, 1981, he was drunk and angry. Doreen testified that she saw defendant deliberately load the gun on the night her mother was killed, and contrary to defendant's testimony, the trip to Bayfield occurred after, not before the shooting.

Thus, defendant did not leave the house with the gun before Alice was shot, and would not have been merely returning the gun to its usual place in the bedroom dresser drawer when it discharged accidentally, as he testified. F.B.I. firearms expert Agent Albrecht testified that the murder weapon cannot be fired unless the trigger is depressed while the hammer is in a fully-cocked position, from which the jury could reasonably have disbelieved defendant's claim of accident. The evidence was clearly sufficient to support the jury's verdict of guilty.

AFFIRMED.