[Cite as *State v. Rose*, 2025-Ohio-5659.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2025-CA-12 |
| Appellee | : | |
| | : | Trial Court Case No. 2024 CR 133 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| CALEB ANTHONY ROSE | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on December 19, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Christopher B. Epley*

CHRISTOPHER B. EPLEY, PRESIDING JUDGE

TUCKER, J., and HUFFMAN, J., concur.

MARK J. BAMBERGER, Attorney for Appellant
JANE A. NAPIER, Attorney for Appellee

EPLEY, P.J.

{¶ 1} Defendant-Appellant Caleb Anthony Rose appeals from his conviction in the Champaign County Court of Common Pleas after he was found guilty of two counts of sexual battery, two counts of rape (along with attendant firearm specifications), and one count of menacing by stalking and then sentenced to an indefinite term of 24 to 28 years in prison. For the reasons that follow, the judgment of the trial court is affirmed.

## I.     Facts and Procedural History

{¶ 2} In August 2024, Rose and T.S., his former girlfriend, were in a long-term relationship. The couple and their four children (two children from their relationship and two from T.S.'s previous relationship) lived in a four-bedroom two-story house in St. Paris. T.S. was a stay-at-home mom, and Rose worked full-time to provide for the family.

{¶ 3} While the relationship had lasted approximately six years, things were not always smooth. T.S. testified that they often argued about topics ranging from the house not being clean enough to Rose's jealousy issues. "He was always accusing me of wanting to be with someone else or wanting to leave." Trial Tr. at 146. According to T.S., sometimes the arguments escalated, and Rose would scream in her face. "He would call me a whore. He would call me a bitch. Oftentimes in front of my children." Trial Tr. at 146. Sometimes things even got violent. T.S. noted that "[t]here were times he would grab me and shove me into another room. Around August, he had slapped me a couple times." Trial Tr. at 146.

{¶ 4} In addition to the general accusations of verbal and physical abuse, T.S. made specific allegations regarding three separate incidents that occurred in August 2024.

{¶ 5} On August 8, 2024, Rose woke up, could not find his phone, and flew into a rage. T.S. secretly audio recorded the incident. The recording revealed a frightening scene of an angry Rose, terrorizing everyone in the house and threatening them with physical harm if his phone was not located. Rose did not just threaten harm, but the audio (which was admitted as State's Exhibit 2) revealed that he hit one of his children. Towards the end of the recording, Rose threatened, "If you don't find the phone in the next 10 minutes, I will burn this fucking house to the ground."

{¶ 6} The next incident took place on August 19, 2024. That morning, Rose came into T.S.'s bedroom looking to have sex. He laid down next to T.S. but, being half-awake and uninterested, she rolled over, intending to send a subtle message. Upon the rejection, Rose became upset; T.S. got up and went to the kitchen to make breakfast. Rose followed her. T.S. then put on regular clothes and headed to the basement and the laundry room. Rose continued to follow, yelling and calling her names. At this point, fearful that things would escalate further, T.S. made another recording (State's Exhibit 1).

{¶ 7} T.S. testified that during this fight, Rose was right in her face, only a couple inches away, and because he was much taller, he "was towering over [her]." Trial Tr. p. 164. During the recording, Rose could be heard yelling, screaming, threatening, and slapping T.S. She spent most of the time sobbing and begging Rose to stop. Towards the end, Rose threatened that he would make T.S. pay for ruining his life and then told her, "I will make sure the last thing I do on this earth is make you miserable." Just before the recording ends, Rose can be heard saying "I don't care if it's fake bullshit or not, you're gonna go upstairs and act like you want me."

3

{¶ 8} According to her testimony, T.S. and Rose went upstairs into her bedroom where he locked one door and barricaded another. After several minutes of Rose standing over her, they engaged in oral and vaginal sex. T.S. told the jury that she did not want to participate but relented so things did not further escalate.

{¶ 9} The final incident took place on August 27 and 28, 2024. T.S., who paints, wanted to show Rose a piece she had completed and that she was going to sell on Facebook Marketplace. When she told Rose who she had sold it to – a man, and one she dated in high school – Rose got upset and demanded to see her phone. When she refused, Rose took it anyway. A short time later, Rose became enraged and told T.S. that she "really fucked up this time." Trial Tr. p. 171. He then grabbed T.S.'s hair to make her look at him and threatened to kill her.

{¶ 10} T.S. described what happened next to the jury:

And then he leaves the living room to go into the closet to get a gun and I run into my bedroom to try and hide and he finds me in there and he tells me that I need to come out to the living room and he doesn't want to do this in front of the kids.

Trial Tr. p. 174. She revealed that Rose then pointed a handgun at her and threatened to kill her if she lied. T.S. begged Rose not to hurt her, explained that she had not cheated and that she had not even messaged the person. After an hour, Rose told T.S. that she could go to bed, but that she "should sleep with one eye open." Trial Tr. p. 174.

{¶ 11} The next day, after T.S. got the older kids on the bus, Rose told her that it was not over. "He tells me that I need to go into the bedroom, I told him, 'no, I don't want to.' And he says, 'we can do this the easy way or the hard way.'" Trial Tr. p. 176. T.S. went into the bedroom and Rose threatened her again with the gun, demanding that she tell him the truth.

4

"He is telling me that I deserve to die for what I did. He's telling me that he's going to kill me and kill himself." Trial Tr. p. 176.

{¶ 12} According to T.S., Rose then gave an ultimatum – have sex or die. She acquiesced "because [she] wanted to keep [her] life." Trial Tr. p. 177. Rose put the gun down on the dresser and they engaged in vaginal intercourse. He began to engage in anal intercourse but stopped once T.S. began crying out in pain, begging him to stop. Afterward, Rose told her she "didn't do a very good job for somebody who wanted to keep their life." Trial Tr. p. 177. He then allowed her to get dressed and return to her children.

{¶ 13} After the older children returned from school, T.S. packed their belongings and left, staying with a friend for a few nights. Days later, though, Rose convinced her to come back home, telling her that he would sell the guns and go to therapy.

{¶ 14} Despite returning home, T.S. filed a police report on September 2, 2024. The initial report did not contain allegations of sexual misconduct by Rose, but a second report, from September 9, 2024, did. After an investigation by the Champaign County Sheriff's Department, Rose was charged with two counts of sexual battery (F3), two counts of rape (F1) (along with attendant firearm specifications), and one count of menacing by stalking (M1).

{¶ 15} Prior to trial, Rose filed several motions, including motions in limine to exclude the recorded audio files of the August 8, 2024 ("Lost Phone") and August 19, 2024 ("Basement Fight") incidents, as well as another recording entitled "Lost Wallet and Keys." He argued that the files were irrelevant and overly prejudicial. The trial court agreed that the "Lost Wallet and Keys" audio recording should be excluded because it was not "closely related in time" to the indicted crimes, but overruled Rose's motions as to the other two recordings.

5

**{¶ 16}** The case proceeded to a jury trial on February 18 and 19, 2025, where the jury heard testimony from T.S.; her son, L.B.; her friend, Chelsea Little; and Lt. Ryan Black of the Champaign County Sheriff's Department. Rose did not testify or offer any witnesses on his behalf. After considering the testimony of the State's witnesses and multiple exhibits (including the two audio recordings) from both parties, Rose was found guilty on all charges and specifications. After ordering a pre-sentence investigation, the trial court set disposition for March 19, 2025, where he was sentenced to an indefinite term of 24 to 28 years in prison.

**{¶ 17}** Rose has filed a timely appeal with four assignments of error.

## II.     Minor Child Testimony

**{¶ 18}** In his first assignment of error, Rose argues that "the trial court erred in allowing a clearly unreliable[,] very minor child to testify." Appellant's Brief at 11. It is his belief that L.B., the ten-year-old son of T.S., should not have been permitted to testify.

**{¶ 19}** According to Evid.R. 601(A), "[e]very person is competent to be a witness except as otherwise provided in these rules." There are only a limited number of exceptions, including two that could be applicable here: (1) a person incapable of expressing himself or herself concerning the matter as to be understood, either directly or through interpretation by one who can understand him or her; and (2) a person incapable of understanding the duty of a witness to tell the truth. Evid.R. 601(B)(1)-(2). *See also State v. Said*, 2024-Ohio-277, ¶ 11 (2d Dist.).

**{¶ 20}** We review a decision that determines competency to testify for an abuse of discretion. *State v. Frazier*, 61 Ohio St.3d 247, 252 (1991). "To constitute an abuse of discretion, a trial court's action must be arbitrary, unreasonable, or unconscionable." *Janson v. Janson*, 2025-Ohio-3092, ¶ 9 (2d Dist.), citing *Ojalvo v. Bd. of Trustees of Ohio State Univ.*, 12 Ohio St.3d 230, 232 (1984).

6

{¶ 21} In this case, L.B. was ten years old at the time of trial, and despite Rose's contention that his youth made him unreliable, he was competent to be a witness unless he was incapable of expressing himself concerning the matter so as to be understood or was incapable of understanding the duty of a witness to tell the truth. Evid.R. 601(A)-(B). The transcript reveals a well-spoken child who answered questions appropriately. The only issue *at all* with his testimony was that the court and the prosecutor asked him to speak louder on a couple of occasions. He was clearly able to express himself and there is no evidence that he did not understand the duty to be truthful. We cannot say the trial court erred when it permitted his testimony.

{¶ 22} Rose further argues that L.B.'s testimony should have been excluded as irrelevant because he answered questions that were not related to the charged crimes. However, Rose never objected to this testimony at trial. "A first principle of appellate jurisdiction is that a party ordinarily may not present an argument on appeal that it failed to raise below." *State v. Wintermeyer*, 2019-Ohio-5156, ¶ 10. *See also State v. Schneider*, 1995 WL 737910, *1 (2d Dist. Dec. 13, 1995). The exception to this rule is the plain error doctrine. Plain error arises only when "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

{¶ 23} We cannot say that the outcome of the trial would have been different if L.B.'s testimony had been stricken. Even putting aside his statements that he heard his mom crying after she was allegedly struck by Rose, there was other evidence jurors could have used to reach a guilty verdict. T.S. gave very detailed testimony about the incidents in this case,

7

Chelsea Little noted that T.S. revealed details of the attacks to her, and Lt. Black told the jury that Rose made admissions to him. Additionally, the jury heard two audio recordings that implicated Rose as to the offenses of menacing by stalking and sexual battery. There was no plain error.

{¶ 24} Because L.B. was ten and there was no evidence he was of unsound mind, the trial court did not err in permitting him to testify. Rose's first assignment of error is overruled.

### III. Motion In Limine – Audio Recordings

{¶ 25} In his second assignment of error, Rose contends that the trial court erred when it denied his motion in limine to exclude audio evidence from trial. He contends that the recordings were more prejudicial than probative.

{¶ 26} A motion in limine is a pre-trial request that certain purportedly inadmissible evidence not be referred to or offered at trial. *Black's Law Dictionary* (11th Ed. 2019). It is a tentative, interlocutory ruling by the trial court that reflects its anticipatory treatment of the evidentiary issue. *State v. Walters*, 2023-Ohio-2701, ¶ 25 (2d Dist.). Because the court is entitled to change its mind, finality does not attach when the motion is granted. *State v. Edwards*, 2005-Ohio-6180, ¶ 17. *Accord State v. Grubb*, 28 Ohio St.3d 199, 201-202 (1986) ("In virtually all circumstances finality does not attach when the motion [in limine] is granted.").

{¶ 27} Because there is no finality, "[a]n appellate court need not review the propriety of such an order unless the claimed error is preserved by a timely objection when the issue is actually reached during the trial." *State v. Leslie*, 14 Ohio App.3d 343 (2d Dist. 1984), paragraph one of the syllabus. It is incumbent on a defendant to seek the introduction of the

8

evidence by proffer to enable the trial court to make a final determination as to its admissibility and to preserve an objection for appeal. *Grubb* at 203.

{¶ 28} In this case, Rose filed a motion in limine that asked the court to exclude three audio recordings of altercations between T.S. and him, reasoning that the evidence was irrelevant to the charged crimes and more prejudicial than probative. The court agreed as to one of the recordings, but preliminarily admitted the other two, namely "Basement Fight" and "Lost Phone." During trial, at the appropriate time, defense counsel renewed the objections to the exhibits. Finding as before, however, the court overruled the objections and admitted the evidence. Now, on appeal, Rose sets forth similar arguments, challenging the relevance of the recordings, asserting that they were more prejudicial than probative.

{¶ 29} Evid.R. 401 defines "relevant" evidence. To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. In other words, there must be some probative value to the evidence. Generally, relevant evidence is admissible. Evid.R. 402.

{¶ 30} Even if something is relevant, it still could be excluded. A trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Evid.R. 403.

> "Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word 'unfair.' Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision."

9

*Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001), quoting *Weissenberger's Ohio Evidence*, § 403.3, at 85-87 (2000). If the evidence "arouses the emotions or sympathies of the jury, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial" and subject to exclusion. *Id.*

{¶ 31} "[W]hen determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent." *State v. Lakes*, 2007-Ohio-325, ¶ 22 (2d Dist.). "Courts have characterized Evid.R. 403 as an 'extraordinary remedy' which should only 'be used sparingly because it permits the exclusion of otherwise relevant evidence.'" *State v. Sutherland*, 2021-Ohio-2433, ¶ 29 (2d Dist.), quoting *United States v. Meester*, 762 F.2d 867, 875 (11th Cir. 1985). "The major function of Evid.R. 403 is 'limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'" *Id.*, quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).

{¶ 32} "A trial court has broad discretion in determining whether to admit or exclude evidence. Absent an abuse of discretion that materially prejudices a party, the trial court's decision will stand." (Citations omitted.) *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 66 (1991).

"Lost Phone" Recording

{¶ 33} State's Exhibit 2, the "Lost Phone," was recorded on the morning of August 8, 2024. It memorializes the goings-on at Rose and T.S.'s home after Rose woke up without his phone. The audio reveals that Rose flew into a rage upon realizing his phone was not next to him. He accused everyone in the house – T.S. and the children – of stealing it, and he threatened everyone with harm if it was not found. The audio reveals that he told his four-year-old daughter that he would "whoop [her] ass" if she did not find the phone within 30 seconds. He did more than just threaten harm, though. At the 5 minute and 30 second mark

10

of the recording, the listener can hear Rose strike one of the children, though it is unclear which one. At the end of the recording, Rose threatened to "burn this fucking house to the ground" if the phone was not located.

{¶ 34} There is no question that the audio is prejudicial to Rose, just like most evidence presented by the State in a criminal trial, but we agree with the trial court that it is not *unfairly* prejudicial. The audio that the jury heard from State's Exhibit 2 was from the time period alleged in the indictment during which the crime of menacing by stalking occurred. It also went to prove the crime itself. R.C. 2903.211(A)(1) states that "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person."

"Basement Fight" Recording

{¶ 35} State's Exhibit 1, the "Basement Fight," was recorded on the morning of August 19, 2024. After rejecting Rose's sexual advances, T.S. went to the basement for some laundry. He followed, furious, and then after intimidating and threatening T.S., demanded she go back upstairs "to do one fucking thing and one thing only." Trial Tr. at 165. In addition, at the 5 minute and 50 second mark, just before the recording was shut off and T.S. went upstairs, Rose can be heard saying, "I don't care if it's fake bullshit or not, you're gonna go upstairs and act like you want me."

{¶ 36} Much like the "Lost Phone" recording, the "Basement Fight" recording was relevant. This one was made in very close temporal proximity to the sexual battery alleged in Counts One and Two and could be used to show that Rose's words and actions caused T.S. to submit to sexual activity. *See* R.C. 2907.03.

11

{¶ 37} And while both recordings were difficult to listen to at times due to Rose's angry outbursts, foul language, and the raw emotions exhibited by T.S., they did not rise to the level of evoking a sense of horror or igniting an instinct to punish. Unfairly prejudicial evidence "appeals to the jury's emotions rather than intellect" and we do not have that here. *Oberlin*, 91 Ohio St.3d at 172, quoting *Weissenberger's Ohio Evidence*, § 403.3, at 85-87 (2000). "The balance should be struck in favor of admission because the dangers associated with the potentially inflammatory evidence must substantially outweigh its probative value." *Sutherland*, 2021-Ohio-2433, at ¶ 31 (2d Dist.), citing *Amesse v. Wright State Physicians, Inc.*, 2018-Ohio-416, ¶ 36 (2d Dist.). The evidence in this case does not rise to that level.

{¶ 38} The trial court did not abuse its discretion when it overruled the motion in limine and permitted the two recordings to be admitted into evidence at trial. Rose's second assignment of error is overruled.

### IV.     Manifest Weight

{¶ 39} Rose's third assignment of error asserts that the jury erred by finding him guilty because the verdicts were against the manifest weight of the evidence.

{¶ 40} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A case should not be reversed as being against the manifest weight of the evidence except "'in the exceptional case in which the evidence weighs *heavily* against the conviction.'" (Emphasis added.) *Id.* "When engaged in this limited reweighing, the

12

appellate court may not merely substitute its view for that of the trier of fact[.]" *State v. Thompson*, 2017-Ohio-8375, ¶ 25 (10th Dist.).

Rape

**{¶ 41}** To secure a conviction for rape, the State had to prove that Rose engaged in sexual conduct with T.S. by compelling her to submit by force or threat of force. R.C. 2907.02(A)(2). Sexual conduct is "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A).

**{¶ 42}** T.S. testified that on the evening of August 27, 2024, she went to Rose to tell him about a painting she was going to sell on Facebook Marketplace. But, when he found out who had purchased it, Rose became enraged and threatened to kill her. After several hours of terror during which Rose pointed a gun in T.S.'s face, Rose told her that she could go to bed, but that she "should sleep with one eye open." Trial Tr. p. 174.

**{¶ 43}** The next day, after T.S. got her older children ready for school, Rose came back into the room and forced her to go upstairs to the bedroom. T.S. told the jury that once they were back in the bedroom, Rose again threatened her with the gun. "He is telling me that he is going to kill me if I don't tell him the truth, he is telling me that I deserve to die for what I did. He's telling me that he's going to kill me and kill himself." Trial Tr. p. 176. Rose then gave T.S. an ultimatum – have sex or die. She agreed "because [she] wanted to keep [her] life." Trial Tr. p. 177. According to T.S., she and Rose engaged in vaginal intercourse. He then began to engage in anal intercourse but stopped once T.S. began crying and begged him to stop. T.S. testified that she did not want to have sex with Rose but did because she was scared.

13

{¶ 44} In addition to T.S.'s testimony, the jury heard from Chelsea Little that T.S. revealed that she had been held at gunpoint multiple times and that Rose had anally raped her. Rose offered no testimony to refute T.S.'s version of events.

{¶ 45} Based on the evidence presented at trial, we cannot say that the jury lost its way or created a manifest miscarriage of justice when it found Rose guilty of rape. A reasonable juror could have found that T.S. was compelled to submit to sexual conduct with Rose by threat of force.

Sexual Battery

{¶ 46} R.C. 2907.03(A)(1) states that no person shall cause another to engage in sexual activity with the offender when the offender knowingly coerces the other person to submit by any means that would prevent resistance by a person of ordinary resolution. "Coercion for purposes of sexual battery is broader than the force required to prove rape and necessarily includes all uses of force. Force is not required to prove coercion." *State v. Wilkins,* 64 Ohio St.2d 382, 386 (1980).

{¶ 47} On the morning of August 19, 2024, Rose became extremely angry after T.S. rejected his sexual advances. He followed her to the basement, got in her face, and began yelling at her to "go the fuck upstairs." State's Exhibit 1 at 1:05. According to the "Basement Fight" recording, a minute and a half later there was a struggle. The listener can hear T.S. cry out "no" and then Rose quickly snarls, "get the fuck up there." At the 3 minute and 45 second mark, Rose can be heard threatening to send T.S.'s children from a previous relationship back to California to be with their father. A few seconds later, T.S. begins to sob, begging Rose to stop. Undeterred by T.S.'s emotions, at the 4 minute and 25 second mark, Rose threatens, "I'm gonna fuck you up. You motherfucker." A minute later, after T.S. says she wants to go upstairs to make breakfast for the kids, Rose tells her she can go upstairs

14

to do one thing and one thing only – have sex with him. Trial Tr. p. 165. "I don't care if it's fake bullshit or not, you're gonna go upstairs and act like you want me." State's Exhibit 1 at 5:50.

{¶ 48} According to trial testimony, T.S. relented and went upstairs with Rose. He locked one bedroom door and barricaded the other. T.S. testified that she sat down on the bed, and for several minutes, Rose menacingly stood over her. T.S. told the jury that while she did not want to have oral and vaginal sex with Rose, she did it anyway because she did not want things to escalate further.

{¶ 49} The jury did not lose its way when it found that Rose coerced T.S. into engaging in oral and vaginal sex with him. It was reasonable to believe the testimony that T.S. submitted to sex based on Rose's words and actions.

Menacing By Stalking

{¶ 50} According to R.C. 2903.211(A)(1), "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person."

{¶ 51} The August 8, 2024 fight, memorialized by the "Lost Phone" recording (State's Exhibit 2), is the incident associated with the charge of menacing by stalking. On that day, Rose woke up and became upset because he could not find his phone. The audio and testimonial evidence reveals that Rose accused everyone of stealing his phone and made multiple threats to almost everyone in the house. For instance, at the 5 minute mark, Rose yells that "If I don't get my phone, I'm going to fucking lose my mind." At the 8 minute and 26 second mark of the recording Rose demanded that his 4-year-old daughter find the phone within 30 seconds or he would "whoop [her] ass." Later in the recording he threatened to

15

destroy the home, saying, "If you don't find the phone in the next 10 minutes, I will burn this fucking house to the ground." State's Exhibit 2 at 14:20.

{¶ 52} Based on the record, we cannot say that the jury lost its way when it found Rose guilty of menacing by stalking. A reasonable juror could find that Rose's threats and outbursts during this incident led T.S. to believe that he would cause physical harm to her or her children.

{¶ 53} Rose's convictions were supported by the weight of the evidence, and his third assignment of error is overruled.

## V. Cumulative Error

{¶ 54} In his fourth and final assignment of error, Rose asserts that the outcome of the case was affected by cumulative error.

{¶ 55} The cumulative error doctrine states that a conviction will be reversed where "the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). This doctrine, however, only applies where there are "multiple instances of harmless error." *Id*.

{¶ 56} To find cumulative error we must find: (1) that multiple errors were committed at trial, and (2) there is a reasonable probability that but for the multiple errors, the outcome of the trial would have been different. *State v. Goldblum*, 2014-Ohio-5068, ¶ 58 (2d Dist.).

{¶ 57} In this case, we have not found any errors from the trial court and, because of that, the cumulative error doctrine is inapplicable. Rose's fourth assignment of error is overruled.

## VI. Conclusion

{¶ 58} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J., and HUFFMAN, J., concur.