# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 16, 2010

No. 09-50770

Lyle W. Cayce
Clerk

CFS FORMING STRUCTURES CO., INC.

Plaintiff-Appellee

v.

FLINTCO, INC.

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas
No. USDC 1:07-cv-00973-LY

Before KING, WIENER, DENNIS, Circuit Judges.

PER CURIAM:[*]

This contract dispute arises out of a construction contract to build a conference center in San Marcos, Texas. Defendant-Appellant Flintco, Inc. ("Flintco") is a general contractor who contracted with Plaintiff-Appellee CFS Forming Structures, Inc. ("CFS") to perform concrete work on the conference center and an adjacent hotel. During the course of construction, Flintco sent CFS a "cure" letter, pursuant to their subcontract, which directed CFS to "commence" installation of concrete work. Ten days later, asserting that

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

installation had not commenced, Flintco terminated its subcontract with CFS and hired another concrete subcontractor. CFS sued Flintco for breach of contract, and Flintco counterclaimed for breach of contract. A jury returned a verdict for CFS and against Flintco. Flintco properly moved, post-verdict, for a judgment as a matter of law ("JMOL"), which the district court denied. Flintco then timely filed a notice of appeal, asserting that the district court abused its discretion in instructing the jury and erred in denying Flintco's motion for JMOL. We affirm.

## I. FACTS AND PROCEEDINGS

The subcontract at issue was signed on February 6, 2007. It provided that CFS's work was to occur on or before the date specified in the "master project schedule." This term was not defined in the subcontract, and no date for work completion was specified. The subcontract also contained a "time is of the essence" provision. Crucially, paragraph 9 of the subcontract also gave CFS the right to "cure" any noncompliance under the subcontract for "fail[ure] or refus[al] to proceed with or properly perform Work as directed by FLINTCO . . . ." Specifically, the subcontract stated that "FLINTCO shall notify Subcontractor in writing of Subcontractor's failure to comply. If FLINTCO determines that Subcontractor has not remedied and cured the event(s) of default within three (3) days of written notification, then FLINTCO may . . . terminate this Subcontract . . . ."

Central to the organization and coordination of the overall construction project was the "master project schedule," which the district court held to be the "critical path method" schedule (the "CPM"). This CPM scheduled the project's tasks, specifying both commencement and completion dates, and arranged the sequence of each task so that, as necessary, it would occur before, during, or after other tasks. "Noncritical" tasks were those that, if delayed or not timely completed, would not delay the project's ultimate completion date; "critical"

tasks were those whose delayed or untimely completion would delay the project. The CPM was updated and re-issued by Flintco monthly as tasks were completed or not completed; a particular task's status could shift between noncritical and critical.

The bid documents that predated the subcontract's execution contained a baseline schedule outlining the subtasks and the project completion date. This was re-issued on February 22, 2007, with new interim dates and a project completion date of October 14, 2008. This completion date never changed during the course of the nine interim CPM updates that CFS received between the subcontract's execution and its termination by Flintco on October 9, 2007. Completion dates for some tasks did change, however, including, for example, CFS's slab work, which was eventually scheduled to be completed by October 25th. After construction commenced, there were multiple alterations to the CPM schedule issued by Flintco, which pushed back CFS's schedule several times. Accordingly, CFS could not and did not commence or complete its work either as originally scheduled or by the updated schedule.

Because of delays attendant on the installation of concrete by CFS, Flintco became concerned about meeting the project's ultimate deadline and being able to proceed with other components of the project, such as structural steel installation. Attributing the delay in concrete floor installation to what Flintco considered to be CFS's dilatory performance, Flintco's project manager sent CFS a "cure letter" on September 28, 2007, which directed that CFS "commence" operations on the "conference center slab on grade" task. The cure letter stated that the slab work was scheduled to be completed by October 8. Immediately after sending the letter, the project manager left on vacation. As soon as it received the letter, CFS "commenced" the slab work by laying down vapor barriers, applying pest control, grading the site, and the like. It also scheduled concrete pours for October 10 and 11. Importantly, CFS put on evidence at trial

that the cure letter's October 8 completion date came from an older CPM update and that the CPM date in effect on September 28 was actually October 25.

The project manager returned from vacation on October 8 and was authorized by Flintco to terminate CFS's subcontract on October 9. He did so by letter, stating that, because "no significant carton form operation has taken place" Flintco deemed CFS to have refused to commence work under the subcontract.

At the jury charge conference before commencement of the jury trial on the parties' opposing breach of contract claims, the opposing parties' lawyers disagreed on the appropriate structure of the jury charge. Flintco wanted the court to use a so-called *Mustang Pipeline*[1] charge ("*Mustang* Charge") which would ask disjunctively (1) whether either party was in breach, and (2), if so, which breach occurred first. Flintco also objected to the fact that the court's proposed jury charge would ask if CFS was in breach at the time of the Flintco cure letter, September 28, rather than at the time of the subcontract's termination, October 9.

The district court denied these objections and submitted the jury charge without Flintco's proposed changes. The court also held as a matter of law that the CPM in effect on September 28 was the "master project schedule" for purposes of CFS's putative breach, ruling that this date was the only reasonable candidate. Flintco argued that the February baseline schedule should be the master schedule, but the court discounted this, reasoning that heavy rain delays in the spring, which in turn had delayed the beginning of construction, as well as the fact that the CPM updates effected multiple changes in interim task completion dates, rendered the February schedule untenable.

The submitted jury charge read:

---

[1] *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195 (Tex. 2004).

No. 09-50770

Question 1: Do you find that CFS was in compliance with the master project schedule on September 28? If "No"proceed to question 2; if yes, proceed to question 3.
Question 2: Do you find that CFS satisfied the notice in the "cure letter" of September 28 by commencing operations?  If yes, proceed to question 3; if "no" proceed to question 4.
Question 3: What amount of money would compensate CFS for Flintco's termination?
Question 4: What amount of money would compensate Flintco for CFS's breach?

The jury found that CFS was not in breach of the subcontract on September 28 and awarded it damages for Flintco's unjustified termination. Flintco then moved for a JMOL, asserting that CFS's actions were a *material* breach of contract because of the "time is of the essence" clause.  The district court denied this motion.

On appeal, Flintco contends that the district court abused its discretion by (1) not giving a *Mustang* Charge in the disjunctive, and (2) not instructing the jury to determine CFS's putative breach as of the day that Flintco terminated the subcontract with CFS.  Flintco also claims that the district court erred in denying its JMOL motion because CFS's actions constituted a material breach of the subcontract by virtue of its "time is of the essence" clause.

## II. ANALYSIS

A. Standard of Review

We review challenges to jury instructions for abuse of discretion.[2]  "A judgement will be reversed only if the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations."[3]  "In diversity actions, a federal court's jury instructions must accurately describe the applicable state substantive law, but the district court

---

[2] *Huss v. Gayden*, 571 F.3d 442, 460 (5th Cir. 2009).

[3] *United States v. Monroe*, 178 F.3d 304, 307 (5th Cir. 1999).

No. 09-50770

has wide discretion in formulating the charge."[4]  Even if we find error, "we will not reverse if we determine, based on the entire record, that the challenged instruction could not have affected the outcome of the case."[5]

We review a district court's grant or denial of a JMOL *de novo*, applying the same legal standard as the district court.[6]  "A motion for judgment as a matter of law . . . in an action tried before a jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict."[7]  JMOL is proper when, after a party as been heard by a jury, there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.[8]

B. Discussion

The facts here closely track those in *Mustang Pipeline* . There, the pipeline owner Mustang Pipeline contracted with Driver to build a pipeline. The contract dictated that time was of the essence in the completion of the work by Driver.[9]  Driver's work was delayed, and Mustang repeatedly asked for assurances that the work would be timely completed.  Convinced by Driver's pattern of delay that the project would not be completed on time, Mustang ultimately terminated the Driver contract forty days before the targeted completion date and hired another pipeline contractor.

---

[4]  *Baker v. Canadian Nat'l/Ill. Cent. R.R.*, 536 F.3d 357, 363-64 (5th Cir.2008).

[5]  *Wright v. Ford Motor Co.*, 508 F.3d 263, 268 (5th Cir.2007).

[6]  *Flowers v. Southern Regional Physician Serv's, Inc.*, 247 F.3d 229, 235 (5th Cir. 2001) (citation omitted).

[7]  *Ford v. Cimarron Ins. Co.*, 230 F.3d 828, 830 (5th Cir. 2000).

[8]  *Id.*

[9]  The several opinions that resulted are silent as to whether there was also a "cure" provision, but if such a  provision existed, it played no role in the determinations of either the trial court or the appellate courts.

No. 09-50770

Mustang then sued Driver for breach of contract, and Driver counterclaimed for wrongful termination of the contract. The case was tried to a jury, and the trial court submitted the following four-question charge:

> 1) Did Driver Pipeline Company fail to comply with the contract it had with Mustang Pipeline Company?
> 2) Was Mustang Pipeline Company justified or not justified in terminating Driver Pipeline Company?
> 3) What sum of money, if any, if now paid in cash would fairly and reasonably compensate Mustang Pipeline Company for its damages, if any, that resulted from such failure to comply?
> 4) What sum of money would fairly and reasonably compensate Driver for its damages, if any, that resulted from Mustang's failure to comply with the Contract?[10]

Although the jury found that Driver had breached the contract, it also found that Mustang had wrongfully terminated the contract. Mustang moved to set aside the jury's verdict as to Mustang's conduct, arguing that, if Driver materially breached the contract first, Driver could not then seek damages for wrongful termination. The trial court denied Mustang's motion, and it appealed. The intermediate appellate court affirmed the trial court, holding that the jury verdict as to Mustang could only be set aside if Driver's breach was material, and that materiality was a question for the jury. The Texas Supreme Court reversed, holding that, based on the evidence of Driver's delay, the emphasis that Mustang had placed on (1) timeliness, (2) the aggressive schedule which had never varied in target completions dates, and (3) the "time is of the essence" clause, Driver's breach was material as a matter of law.[11] Accordingly, the Texas Supreme Court set aside the verdict against Mustang.[12]

---

[10] *Id.* at 197.

[11] *Id.* at 200.

[12] *Id.*

No. 09-50770

The court then noted in dicta that the jury instruction's defects could have been avoided by a charge worded in the disjunctive, reasoning:

> These problems could have been avoided had the trial court submitted the breach of contract question disjunctively ("Did Driver Pipeline Company or Mustang Pipeline Company fail to comply with the parties' contract?") accompanied by an appropriate instruction directing the jury to decide who committed the first *material* breach.
>
> ....
>
> In the standard contract dispute, one party cancels the contract or refuses to pay due to alleged breaches by the other; in such circumstances, jurors will often find both parties failed to comply with the contract (as the jury did here) unless instructed that they must decide who committed the first material breach.[13]

Flintco insists that this case is indistinguishable from *Mustang Pipeline* and that the district court abused its discretion in refusing to give the disjunctive jury instruction mentioned in dicta by the Texas Supreme Court. Specifically, Flintco asserts that "when a party contends that its termination of a contract is excused because the other committed a material breach first, the issue should be submitted . . . in the disjunctive. That is, the question should ask whether either party breached, and if both did, which party breached first." Flintco also urges that the jury instructions submitted by the district court were in error because they presume that, if the jury should find that CFS was either not in breach on September 28 or was in breach and failed to cure that breach in the cure period, Flintco's termination was automatically wrongful. Flintco asserts that a *Mustang* Charge would have obviated this problem, i.e., when both parties are in putative breach, by allowing the jury to determine which party breached first. According to Flintco, this would effectuate the principle that a contract is not enforceable against a party in putative breach when there is an antecedent material breach by the other party.

---

[13] *Id.* (emphasis added).

Contrary to Flintco's contention that the sequence of the breaches is the essential issue, the key question that the Texas Supreme Court's instruction in *Mustang Pipeline* attempted to resolve is *materiality*. If the jury finds that both parties breached the contract under facts akin to those in *Mustang Pipeline*, i.e., a second breach that occurs as a result of an earlier breach, the sequence of the breach – who breached first – is obvious. In *Mustang Pipeline*, Driver had to breach first because that was the antecedent event to the subsequent breach by Mustang, after which no further business was done between the parties. Because Driver was alleged to have breached first and Mustang second, the determinative question was whether Driver's initial breach was *material*. This is borne out by the *Mustang Pipeline* court's analysis, which was concerned *solely* with whether Driver's delay constituted a *material* breach as a matter of law, and thus excused Mustang's subsequent breach.[14]

The district court's jury instructions here adequately capture the question of materiality despite their not being worded in the disjunctive. The charge contains the implicit assumption that the breaches, if they occurred, were material.[15] That is, the jury questions require that, (1) if the jury finds that CFS breached the subcontract by failing to comply with the CPM , Flintco must

---

[14] *Mustang Pipeline*, 134 S.W.3d at 200.

[15] Under the jury instructions, this is true for both parties. If the jury had found that CFS was not in compliance on September 28th and failed to cure, its breach was deemed, under the questions, to be material because the jury was then to assess damages. Importantly, if the jury had found CFS to be in breach, it was *not* to consider whether Flintco breached the subcontract, presumably because, as CFS's delay was material, Flintco's termination could not be wrongful.

This assumption of materiality by the jury instructions is supported by the fact that the questions specifically refer to discrete occurrences as potential breaches. Contrast the specificity of these instructions with those in *Mustang Pipeline*: "Did Driver Company fail to comply with the contract it had with Mustang Pipeline?". 134 S.W.3d at 197. In fact, the very generality of the *Mustang Pipeline* instructions is what gives rise to the need for the Texas court's fix because, under the original instructions, it is impossible to know which specific act of Driver's constituted the breach and, therefore, whether it was material.

be awarded damages, but (2) if CFS was in compliance, then Flintco's termination was wrongful and the jury must determine the quantity of damages incurred by CFS. Even though they do not explicitly require the jury to decide materiality,[16] these instructions will nevertheless establish which breach, if any, is material. And, because of the "cure" provision, CFS could *only* be in breach under the instant facts if it were first notified of a putative breach and afforded an opportunity to cure. There is no question that Flintco terminated the subcontract and that it purported to do so because of CFS's putative failure to cure the delay outlined in the "cure letter." It necessarily follows that if CFS was not actually in breach *vel non*, then the termination for that breach was wrongful.

Under the facts presented at trial, there were only two potential breaches at issue: (1) CFS's tardiness as of September 28, and (2) Flintco's contract termination for delay. The district court's jury instructions put the question of materiality of both breaches to the jury and did so in a way that prevented any possible conflicting jury findings. The charge was proper, given the fact that CFS's "breach" triggered a "cure letter" under the subcontract, and Flintco's breach terminated the entire subcontract before completion. The jury instructions prevented an inconsistent jury verdict, such as the one that occurred in *Mustang Pipeline*. Accordingly, Flintco has failed to show "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations."

---

[16] Put another way, by structuring the instruction in the way that it did, the district court appears to have held that, as a matter of law, each breach, if proved, was material. This is amply supported by the evidence. First, it is clear that an unwarranted termination of the subcontract is a material breach. Termination is only unwarranted if the reason for the breach – here CFS's delay – was not material. Failure to satisfy the requirements of a valid cure letter is also, under the terms of the subcontract, a material breach. Clearly then, both putative breaches at issue were potentially material.

No. 09-50770

Flintco's other issues with the jury instructions are that (1) the verdict form asked the jury whether CFS was in compliance on the date of the cure letter rather than the date of Flintco's termination of the subcontract, and (2) the jury charge refers to "first floor slab," the cure letter refers to commencement of the "slab on grade operation," and the termination letter refers to "slab on carton form operation," potentially confusing the jury.

Flintco has failed to show an abuse of discretion under either issue. First, the termination letter refers to CFS's delay and failure to cure as the reasons for terminating the subcontract, and it references the Paragraph of the subcontract, that outlines the materiality of delay, the right to cure, and the termination consequences for failing to cure. The right to cure for delay means that Flintco had to send the cure letter and give CFS 72 hours to commence curing the delay. Necessarily, CFS could not be in breach until and unless it were never given such notice and right to cure.

Flintco argues in response that CFS's conduct following receipt of the cure letter but before Flintco terminated the subcontract could have supported Flintco's claim of breach. The flaw in this argument is that Flintco sent only one cure letter. It certainly may be (and the jury instructions capture this fact) that if CFS failed to comply with the cure letter in this interim period, it was in breach. Under the terms of the cure provision in the subcontract, however, CFS's conduct during the interim period can only fall into one of four categorical descriptions: (1) continuing compliance with the subcontract, notwithstanding the cure letter's complaints; (2) resulting compliance with the subcontract by correcting the earlier breaches outlined in the cure letter; (3) continuing non-compliance with the subcontract through failure to comply with the cure letter; or (4), irrespective of any earlier breach, committing an independent breach of the subcontract.

11

No. 09-50770

The jury instructions capture only the first three of these possibilities by charging the jury to consider CFS's alleged breach *as of September 28*. This is absolutely the correct date to use, however, because CFS could *only* have been in breach for delay *after* being notified and afforded the opportunity to cure. If CFS had in fact committed a *new* breach in the interim period after the cure letter, i.e., conduct other than that complained of in the cure letter, Flintco would have been obliged to issue a new cure letter and give CFS another 72 hours to cure before lawfully terminating the contract. Otherwise, any conduct occurring in the interim period would not be actionable or be related to the initial cure letter. As it is undisputed that Flintco sent only the September 28 cure letter, the district court's decision to charge the jury with determining CFS's compliance as of that date was not only not an abuse of discretion, but the only licit choice. If instead of the cure letter's date, the court had specified the subcontract's termination date as the material date of breach, the jury could have found CFS in breach for conduct unrelated to the September 28th cure letter. Such a finding would have been wrongful, however, because the evidence shows that no subsequent conduct was ever afforded the cure period as required by the subcontract. By setting September 28 as the date of putative breach, the district court prevented this erroneous outcome. Accordingly, the court's date of choice does not give rise to substantial doubt that the jury was misguided in its deliberations.

Flintco also claims that the term "first floor slab" may have misled the jury to conclude that CFS's initial steps to lay down the concrete slab constituted "commencement" under the cure letter when, in fact, the cure and termination letter's terminology actually contemplated commencement of the "final stages" of the slab work. Flintco simply states that the term "first floor slab" is "narrower," and that the "earlier steps" CFS undertook after the cure letter were

not what Flintco complained of and "should not have been considered steps toward compliance."

Beyond these bald assertions, Flintco does not otherwise support its contention that the term "first floor slab" misled the jury to view non-compliant conduct erroneously as compliant. The cure letter lucidly states that CFS has 72 hours after receipt to "commence" its concrete work, and the evidence adduced at trial supports a jury finding that CFS did in fact commence this work. Even assuming that the term is inaccurate, Flintco's self-serving assertions as to the definitions of these terms fail to give rise to "substantial and ineradicable doubt" that the jury was misled or, assuming error, that it affected the outcome of the trial.

Finally, Flintco argues that it is entitled to a JMOL because the "time is of the essence" clause in the subcontract renders CFS's myriad delays material breaches. As discussed above, however, the Texas Supreme Court held in *Mustang Pipeline* held that, *under the discrete facts of that case*, Driver's delay was a material breach of the contract as a matter of law.[17] That court *did not hold* that, in every case, a "time is of the essence" provision *ipso facto* makes *any* delay a *material* breach. Under the JMOL standard, Flintco had to show that the "time is of the essence" provision meant that, in light of the evidence adduced, "there is no legally sufficient evidentiary basis for a reasonable jury to have found" that CFS was in compliance on September 28. First, unlike in *Mustang Pipeline*, CFS had a right to cure any breach for delay. Under the terms of the subcontract, CFS would only be in material breach if it were notified of that fact and afforded an opportunity to cure. As none of the delays prior to the September 28 cure letter prompted a cure letter, CFS could not have been

---

[17] 137 S.W.3d at 200.

in material breach for any conduct preceding the conduct that prompted the cure letter of September 28.

As for its conduct that did prompt the September 28 letter, CFS points out that evidence adduced at trial proved that CFS's work on the slab operation was not delaying the overall project. For example, the CPM in effect on September 28 confirms that the slab was to be completed on October 25, and that it was a "noncritical" task. Furthermore, contrary to Flintco's assertion that the structural steel installation was delayed by CFS's conduct, CFS has shown that Flintco's project superintendent testified that the slab work did not need to be completed for steel installation to commence.

In sum, Flintco has failed to meet the high standard of showing that there is no "legally sufficient evidentiary basis" for the jury's verdict.

## IV. CONCLUSION

For the foregoing reasons, the district court is, in all respects, AFFIRMED.