IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 16, 2008

Charles R. Fulbruge III
Clerk

No. 06-60138

CHARLES E. BAKER,

Plaintiff–Appellant,

v.

CANADIAN NATIONAL/ILLINOIS CENTRAL RAILROAD,

Defendant–Appellee.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:03-CV-905

Before HIGGINBOTHAM, SMITH, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Charles Baker sued "Canadian National/Illinois Central Railroad" for injuries sustained after its train struck the dump truck Baker was driving. The railroad, whose correct name is Illinois Central Railroad Company and to which we will refer as Illinois Central, prevailed in a trial before a jury. Baker appeals and alleges numerous errors. We affirm.

I

Illinois Central hired a contractor, W.S. Red Hancock, Inc. (Hancock), to remove vegetation, dirt, and other obstructions from the railroad's right of way at a public railroad crossing that Illinois Central maintained. Charles Baker worked for Hancock as a dump-truck driver. Together with Ken Henderson,

another Hancock driver, Baker was to haul the cleared debris from the job site to a local landfill.

The job site was located approximately twenty to thirty feet from the closest rail, though the parties disputed the site's exact proximity to the tracks. There were stop signs and railroad crossbucks where the public road on which Baker traveled in leaving the job site intersected the tracks, but neither Illinois Central nor Hancock provided flagmen or watchmen to warn the work crew of approaching trains. Some of Baker's co-workers, including the other truck driver Henderson, testified they believed flagmen were unnecessary for this job site, though one did recall an unnamed co-worker's unsuccessful request for a flagman. Baker's expert, Edward Stanton, whose companies performed similar work, testified he believed a flagman was necessary and that companies generally used flagmen at sites he considered far safer than Green's Crossing, the site of the accident. James Loumiet, Baker's expert on railroad–highway safety, agreed with Stanton that a flagman was necessary for safety.

Shortly after 9:00 a.m., Baker followed Henderson across the tracks, and the Illinois Central's train struck Baker's truck. Baker testified that he did not see or hear the approaching train before the accident. Nonetheless, he concedes that Richard Dunn, the locomotive engineer, sounded the horn and bell in compliance with the law and was traveling within the maximum speed limit set by the Federal Railroad Administration (FRA).

Baker also testified that by the time he pulled off the job site and straightened his truck on the road, it was on the tracks, though he also claimed not to remember any events occurring after he released his parking brake. Baker's son, also an experienced truck driver but not an eyewitness, testified that in his opinion Baker would have been unable to pull his truck perpendicular to the crossing until the truck was on the tracks. Both agreed that Baker was

unable to approach the tracks without some or all of his truck entering the road's left lane for oncoming traffic.

Nonetheless, several eyewitnesses disputed the Bakers' testimony. The locomotive engineer testified that Baker's truck was "squared up with the railroad tracks" and "all in his lane" moments before the accident. Baker's co-worker, Leon Davis, testified that, before Baker crossed the tracks, his truck was positioned such that he had the same view that any other motorist traversing the crossing would have had. The other driver, Henderson, testified he was able to straighten his own truck at the stop sign, which provided him a ninety-degree angle to view the track like any other motorist. However, Baker's and Henderson's trucks were different makes and models.

Several eyewitnesses testified that Baker never stopped for the stop sign or warning devices, though they agreed his truck was traveling no faster than two miles per hour at the time of collision. Dunn, the locomotive engineer, testified that Baker never appeared to look for an approaching train. As Dunn approached, he observed Baker's co-workers running towards the truck and waving their arms, warning Baker of the approaching train.

Baker sued Illinois Central and alleged it was negligent for failing to provide flagmen or other protections to Baker and for not installing lights or gates. Baker filed a motion for partial summary judgment and argued that the Roadway Worker Protection Rules (RWPR) required Illinois Central to provide a flagman, watchman, or other protection because the work required the crew to "foul the tracks" by placing themselves in a position where a train could strike either them or their equipment and that Illinois Central did not dispute the absence of such warning systems. The district court denied Baker's motion and would later deny Baker's motion for a judgment as a matter of law.

The case proceeded to a jury trial with a verdict in favor of Illinois Central. The jury specifically found that Baker's work did not require him to "foul the

3

tracks" as that term was defined in the district judge's instructions. Baker appeals the outcome and alleges approximately sixteen errors and sub-errors.

II

Baker argues that the trial court erred in denying his motion for judgment as a matter of law in which he contended that the Illinois Central violated duties to provide a flagman under both the RWPR and common law and the breach of those duties was the proximate cause of the collision. The district court previously denied Baker's motion for partial summary judgment that asserted these same grounds. This court reviews de novo the denial of motions for judgment as a matter of law, applying the same standards the district court applied.[1] The district court should grant the motion if, after considering all evidence in the light most favorable to the party opposed to the motion, the facts and inferences strongly and overwhelmingly favor the moving party so that the court concludes reasonable jurors could not arrive at a contrary verdict,[2] or if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.

We note at the outset that fact issues existed as to proximate cause under Mississippi law. The undisputed evidence indicated that Baker ran through the stop sign. Under Mississippi law, even if the railroad company were negligent, Baker's violation of three different statutory duties to stop[3] was arguably a proximate cause of the accident. Thus, the district court did not err as to proximate cause. For the same reasons, the district court did not err in rejecting

---

[1] Bellows v. Amoco Oil Co., 118 F.3d 268, 273 (5th Cir. 1997).

[2] Id.

[3] MISS. CODE ANN. § 77-9-249(1) (requiring a driver to stop at railroad tracks when locomotive emits signal within nine-hundred feet of crossing); MISS. CODE ANN. § 77-9-249(4) (requiring a driver to stop at crossbucks regardless of train's approach); MISS. CODE ANN. § 63-3-1009 (requiring a driver to stop at stop signs erected near railroad crossings).

Baker's contention that Illinois Central was negligent per se under Mississippi law.

## A

Baker argues that the district court erred by denying the two motions regarding whether Illinois Central violated its duties under the RWPR. Illinois Central, however, disputes whether the RWPR apply.

The RWPR require that qualifying railroads adopt and implement an on-track safety program that will afford on-track safety to all roadway workers.[4] The regulations define "on-track safety" as "a state of freedom from the danger of being struck by a moving train or other railroad equipment, provided by operating and safety rules that govern track occupancy by personnel, trains and on-track equipment."[5] The regulations further define "roadway worker" as:

> [A]ny employee of a railroad, or a contractor to a railroad, whose duties include inspection, construction, maintenance or repair of railroad track, bridges, roadway, signal and communication systems, electric traction systems, roadway facilities or roadway maintenance machinery on or near track or with the potential of fouling a track, and flagmen and watchmen/lookouts as defined in this section.[6]

Neither party disputes that Baker was an employee of a contractor to a railroad, but they do dispute whether the work that day was "on or near track or with the potential of fouling a track." "Fouling a track" is the "placement of an individual or an item of equipment in such proximity to a track that the individual or equipment could be struck by a moving train or on-track equipment, or in any case is within four feet of the field side of the near running

---

[4] 49 C.F.R. § 214.303.

[5] 49 C.F.R. § 214.7.

[6] Id. (emphasis added).

rail."[7]  Presumably, if "fouling a track" is placing an individual or equipment within four feet, at a minimum, of the track, then the phrase "on or near track" provides some additional coverage beyond four feet.

The evidence indicated that the job site was located, at its nearest point, twenty to thirty feet from the closest rail.  At that distance, Baker did not, as a matter of law, have the potential to foul the track, nor was he on or near the track.  Nonetheless, Baker argues that he certainly fouled the track; the train actually hit him.  That fact, however, is not dispositive, because Baker fouled the tracks and was hit away from the work site.  The proximity of the work site to the track determines whether the RWPR apply, not whether a worker fouls the tracks after leaving the work site.  Thus, the RWPR did not apply, and the court did not err by denying Baker's motions regarding Illinois Central's duty under the RWPR.

We do not reach the question of whether Baker ceased to be a "roadway worker" once he drove his truck onto the public road, an issue that the district court decided adversely to Baker.

B

Baker next argues the district court should have ruled that as a matter of law Illinois Central violated its common-law duties.  Baker based his motions on his expert's testimony that whenever the expert's companies worked as independent contractors performing work similar to that of Hancock, the railroads provided flagmen or similar protections and that Illinois Central's failure to post a flagman was unreasonable.  By analogy, Baker argues that in medical malpractice cases a jury cannot reject a physician's testimony regarding the standard of care, even if lay witnesses testify that the defendant need not follow the standard.  Baker also cites Young v. Illinois Central Gulf Railroad Co.,

---

[7] Id.

in which this court stated it is "absurd" to believe the average layman knows the necessities of railroad crossing safety.[8] This language was in reference to the district court's exclusion in Young of an expert on crossing safety.

Baker's expert offered opinion testimony that was challenged and rebutted by another expert who testified that he did not believe a flagman was necessary. The district court did not err in denying Baker's motion for judgment in this regard.

## III

Baker argues that the district court erred in its jury instructions and in denying his motion for a new trial. We review challenges to jury instructions for an abuse of discretion and will reverse the judgment only if the charge as a whole creates a substantial doubt as to whether the jury has been properly guided in its deliberations.[9]

In diversity actions, a federal court's jury instructions must accurately describe the applicable state substantive law, but the district court has wide discretion in formulating the charge.[10] We review de novo a district court's determination of a question of state law, but a party is entitled to reversal for a district court's failure to give a particularly requested instruction only if the jury was misled by the given instructions.[11]

## A

Baker first argues the district judge refused to add to the Special Verdict form his claim that Illinois Central violated its common law duty of ordinary care when it failed to provide a flagman to the Hancock crew. Specifically, Baker

---

[8] 618 F.2d 332, 338 (5th Cir. 1980).

[9] Dahlen v. Gulf Crews, Inc., 281 F.3d 487, 494 (5th Cir. 2002).

[10] Broad. Satellite Int'l v. Nat'l Digital Television Ctr., 323 F.3d 339, 347 (5th Cir. 2003).

[11] Folks v. Kirby Forest Indus. Inc., 10 F.3d 1173, 1174 (5th Cir. 1994).

argues the jury was not given an opportunity to address this issue since by answering "no" to Special Interrogatory 6—whether the crossing was extra-hazardous—the jury never reached Special Interrogatory 7—whether reasonable care required extra precautions.

The district court's arrangement of the Special Interrogatories was correct in light of Mississippi law. Mississippi law generally only requires that a railroad erect a crossbucks at its crossing.[12] If the crossing is extra-hazardous, Mississippi law imposes a duty upon railroads to provide additional warning measures.[13] Moreover, the Mississippi Supreme Court has stated it "know[s] of no statute or other authority placing this duty [to have a flagman] on the railroad as a matter of law."[14] That court has also held that, in the absence of an extra-hazardous finding, the use of crossbucks met the reasonable care the law requires.[15] The district court did not err when it predicated Special Interrogatory 7 on a finding that the crossing was extra-hazardous.

## B

Baker argues the district court incorrectly instructed the jury that the RWPR did not apply to him if he could approach the crossing in the same manner as an ordinary motorist. This instruction did not improperly guide the jury because in response to Baker's RWPR claims, the jury found that his work did not require him to foul the tracks. Accordingly, the jury did not find the factual predicate triggering the RWPR's protections.

## C

Baker contends the district court's instructions repeatedly stated that

---

[12] MISS. CODE ANN. § 77-9-247.

[13] Donald v. Gulf M. & O. R.R., 71 So.2d 776, 777 (Miss. 1954).

[14] New Orleans v. N.E.R. Co. v. Ready, 118 So.2d 185, 188 (Miss. 1960).

[15] Wilner v. Miss. Exp. R.R., 546 So.2d 678, 682 (Miss. 1989).

Mississippi law required Illinois Central to install additional warning devices only if the crossing were extra-hazardous. Baker claims this was prejudicial because it unduly emphasized Illinois Central's position.

This argument has no merit. The district court instructed the jury that Baker alleged the crossing was extra-hazardous and listed the elements he was required to prove. The district court defined "extra-hazardous" in a manner that was not prejudicial to Baker.[16] The district court concluded by advising the jury as to Mississippi's statutory requirements. Baker cites one case, which is easily distinguishable.[17] The instructions were correct statements of Mississippi law and not unnecessarily repetitive.

## D

Baker next argues that the district court erred when it instructed the jury three times regarding Baker's duty to stop. He argues one instruction was sufficient, and that the additional two instructions confused the jury or suggested that Baker's failure to stop was the sole cause of the collision. The district court did not err because each instruction was based on a separate statutory duty.[18]

Nor did the district court err when it did not use Mississippi state-approved jury instructions with respect to these particular instructions. While

---

[16] "[A]ny condition affecting the danger of a crossing may be considered in determining whether the crossing is extrahazardous."

[17] Hanover Fire Ins. Co. v. Sides, 320 F.2d 437, 444 (upholding a district court's decision to refuse six additional instructions with respect to duties Louisiana law imposed on a driver making a left-hand turn after the district court had already instructed the jury on that issue).

[18] MISS. CODE ANN. § 77-9-249(1) (requiring a driver to stop at railroad tracks when locomotive emits signal within nine-hundred feet of crossing); MISS. CODE ANN. § 77-9-249(4) (requiring a driver to stop at crossbucks regardless of train's approach); MISS. CODE ANN. § 63-3-1009 (requiring a driver to stop at stop signs erected near railroad crossings).

the district court's instructions regarding state substantive law must be accurate, the trial judge is given discretion in formulating the specific charge.[19]

E

Baker asserts that his physician testified that Baker could not perform work of any kind due to his intermittent physical and mental impairments and that the district court erred in instructing the jury to consider his ability to mitigate his damages. Baker cites several Mississippi workers' compensation cases for the proposition that a factfinder commits reversible error when it ignores testimony of the plaintiff's treating physicians,[20] and he concludes there was no evidence to support such an instruction, citing Roberts v. Wal-Mart Stores, Inc.[21]

The record, including Baker's own evidence, reflects no error. Illinois Central presented evidence that Baker renewed his commercial drivers' license, regularly drove his own automobile, and traveled on his own. Baker also routinely visited casinos and businesses. Illinois Central's surveillance footage showed Baker squatting and walking. Finally, Baker's own physician testified "there were certainly some jobs [Baker] could perform."

IV

Baker contends that the jury's findings were against the great weight of the evidence, and the district court therefore erred in denying his motion for a new trial. We apply a deferential standard in reviewing a trial court's refusal to grant a motion for new trial. We will not reverse the trial court's decision

---

[19] Broad. Satellite Int'l. v. Nat'l Digital Television Ctr., 323 F.3d 339, 347 (5th Cir. 2003).

[20] See Stewart v. Singing River Hosp. Sys., 928 So.2d 176, 183 (Miss. App. 2005); Johnson v. Ferguson, 435 So.2d 1191, 1193-95 (Miss. 1983).

[21] 7 F.3d 1256, 1258 (5th Cir. 1993) ("A district court may not instruct a jury on a legal theory in support of which no evidence is presented.").

unless there is a clear showing of abuse of discretion.[22]   A "clear showing" requires that the appellant demonstrate "an absolute absence of evidence" to support the jury's verdict.[23]

## A

The jury answered "no" to a special interrogatory asking whether Baker's work required him to "foul the tracks."  The evidence was disputed on this issue.  Additionally, given the undisputed fact that the worksite was twenty to thirty feet from the nearest track, the jury did not err in concluding that the work Hancock performed did not require Baker or his co-workers to foul the track.

Baker argues that a photograph taken immediately after the accident shows that his trailer was in the left lane, rather than the right, a position from which, Baker contends no ordinary motorist would have to approach the crossing.  He contends this photograph means the jury's answer to the interrogatory "comes very close to being contrary to incontrovertible physical facts."  But this ignores other evidence that reflects Baker could have left the work site and pulled his trailer into the correct lane as another driver testified he had done and, more importantly, evidence that even if Baker's trailer was in the left lane, he had an unobstructed view of the tracks and could have observed a train approaching had he looked.

## B

Baker asserts that the jury's finding that Illinois Central did not violate its duty of ordinary care to provide a flagman is against the great weight of the evidence.  For reasons already discussed, this contention has no merit.

## V

---

[22] Duff v. Werner Enters. Inc., 489 F.3d 727, 729 (5th Cir. 2007).

[23] Id. ("Absent 'a clear showing of an abuse of discretion,' we will not reverse the trial court's decision to deny a new trial. . . .  To make such a 'clear showing,' Appellants must demonstrate 'an absolute absence of evidence to support the jury's verdict.'") (citations omitted).

Baker challenges several evidentiary rulings, arguing he is entitled to a new trial. We review admissions of evidence and denial of a new trial under an abuse of discretion standard.[24] We conclude the district judge either was within his discretion or committed only harmless error.

A

The district court excluded evidence of the subsequent installation of lights and gates at the crossing where the accident occurred. The evidentiary rules generally ban the admission of evidence concerning subsequent remedial measures.[25] However, a party may introduce such evidence for a purpose besides demonstrating negligence—such as, ownership, control, or feasibility of precautionary measures.[26]

Baker argues that Illinois Central presented evidence that disputed whether lights and gates would have made Baker safer that day. Specifically, Baker cites the locomotive engineer's testimony that "gates are probably not as safe as just a stop sign and crossbuck" and that any crossing design expert who believed otherwise "could come ride that train with me and they will see I'm right."

Baker relies on Muzyka v. Remington Arms to prove admissibility, in which we held that the district court erred when it excluded evidence of a subsequent redesign for impeachment purposes.[27] Remington's numerous experts called the rifle the safest in the world and stated that the flaw plaintiff alleged presented no danger to consumers, despite the fact that Remington

---

[24] Chiasson v. Zapata Gulf Marine Corp., 988 F.2d 513, 515 (5th Cir. 1993).

[25] FED. R. EVID. 407.

[26] Id.

[27] 774 F.2d 1309, 1314 (5th Cir. 1985).

subsequently corrected the alleged flaw.[28]    After the plaintiff suggested Remington could have redesigned the rifle in the manner the company ultimately did, one expert replied "you want Remington to depart from the judgment of the entire firearm's industry."[29]    We noted that the jury was required to choose between two theories of the case: the rifle unexpectedly fired because of a either a flaw or mishandling.  We concluded it was error to deny the jury evidence impeaching the numerous experts who spoke of the rifle in superlatives.[30]

We decline to analogize the analysis of Remington's numerous experts to the lone opinion of Illinois Central's locomotive engineer, a lay witness. Moreover, when the decision to admit or exclude evidence of a design change is a close call, a district court's decision to exclude the evidence is within its discretion.[31]  Given that the lights and gates were installed two years after the accident, and Baker's almost exclusive reliance on Dunn's testimony as Illinois Central's denial of feasibility, we conclude the district court did not abuse its discretion.

B

The district court did not permit Baker's expert, Edward Stanton, to testify as to the legal meaning of terms used in the RWPR, which went into effect in 1996.  Stanton last worked for a railroad in 1948 and as a railroad contractor in 1987 and stated he had to look up the regulation after his deposition, presumably to familiarize himself with it.  The FRA has given the RWPR's terms specialized meaning, and the district court did not abuse his

---

[28] Id. at 1311-1314.

[29] Id. at 1312.

[30] Id. at 1313.

[31] Hardy v. Chemetron Corp., 870 F.2d 1007, 1011 (5th Cir. 1989).

discretion by excluding Stanton's interpretation of a regulation with which he admitted he had little experience.[32]

C

The district court excluded evidence of a prior accident. Admissibility of such evidence is determined on a case-by-case basis, with the court considering various factors including the theory of recovery, the defendant's defenses, and the degree of similarity between the other accidents.[33]

Baker argues Brazos River Authority requires a district court to admit evidence of prior accidents if there are any similarities, leaving the jury to determine the degree of similarity.[34] The only prior accident about which the record reflects Baker sought to adduce evidence involved a car stalled on the tracks. Even if the trial judge should have admitted evidence of that prior accident, and left the jury to determine the degree of similarity, it was harmless error since it did not affect Baker's substantial rights. We conclude the jury would not have ruled differently based on a single prior and substantially dissimilar accident.

D

Baker retrieved from Illinois Central's website and attempted to introduce a document regarding a company policy to use flagmen whenever workers are within twenty-five feet of the track. Illinois Central objected that Baker failed to lay a proper foundation because he could not prove the policy was in effect at the time of the accident. Without such proof, the policy was a subsequent remedial measure, argued Illinois Central, and was prohibited by the rules of evidence. Illinois Central also argued that the document violated the motion in

---

[32] FED. R. EVID. 602.

[33] Brazos River Auth. v. GE Ionics, 469 F.3d 416, 426 (5th Cir. 2006).

[34] Id.

14

limine because the policy was that of its subsidiary corporation. Baker failed to establish when the policy was created or rebut Illinois Central's claim that the policy was that of its subsidiary. Thus, the judge did not err in excluding it as substantive evidence.[35]

E

The district court admitted surveillance videos of Baker. Baker argues that the videos (1) were disclosed after the discovery cutoff; (2) did not impeach the plaintiff's witnesses; and (3) were more prejudicial than probative. The surveillance videos show Baker engaging in a variety of daily chores, driving, spending full days at crowded casinos, and making routine transactions at banks, grocery stores, and insurance agencies. Illinois Central argues the videos are both substantive evidence of Baker's post-accident condition and impeachment evidence challenging Baker's witnesses who described his mental and physical condition. For example, two of Baker's medical experts testified that Baker had mental problems and memory problems, was incapable of managing his financial affairs (including simple tasks, such as making change and counting money), should not drive, had difficulty dealing with crowds, and needed to live in an assisted living facility.

Baker cites Chiasson v. Zapata Gulf Marine Co.[36] arguing that it is reversible error to admit surveillance evidence that was not disclosed during the discovery period. This is incorrect. Chiasson dealt with a surveillance video that was never disclosed to the plaintiff before trial despite the plaintiff's interrogatory regarding the existence of still or motion pictures of the plaintiff.[37] The defendant responded to the interrogatory by citing "attorney work-product

---

[35] FED. R. EVID. 407.

[36] 988 F.2d 513 (5th Cir. 1993).

[37] Id. at 518.

privilege." The defendant, thereafter, surveilled and recorded the plaintiff and did not supplement its discovery response. During the trial, the district court ruled the defendant could show the surveillance tape to the jury and denied the plaintiff's request to preview the tape. We concluded that, regardless of any impeachment value, the video was of a substantive nature. Therefore we held that the district court erred by admitting substantive evidence undisclosed before trial. We did not hold, as Baker contends, that a surveillance tape disclosed after the discovery cutoff, but before trial, is automatically inadmissible.[38]

Here, Illinois Central produced the surveillance footage in two supplemental responses to Baker's interrogatories approximately nine to ten months before trial. Thus, Chiasson did not require the district court to exclude the videos, which we conclude were properly admitted as substantive evidence.

Baker contends the district court should have excluded the video because it was more prejudicial than probative.[39] Specifically, Baker notes that the surveillance footage shows him spending long periods of time in casinos and draws a connection between that footage and Illinois Central's closing argument, in which its attorney stated Baker had "gambled with his life" by running the stop sign. Baker argues that this evidence informed jurors that he engaged in activities many people consider immoral.

Rule 403 requires that the probative value of the evidence must be "substantially outweighed by the danger of unfair prejudice" before the court

---

[38] See id.; see also Whittaker Corp. v. Execuair Corp., 736 F.2d 1341, 1347 (9th Cir. 1984) ("District courts do have power to prescribe time limits for conducting discovery. The purpose of a discovery cutoff date is to protect the parties from a continuing burden of producing evidence and to assure them adequate time to prepare immediately before trail. A discovery cutoff date does not, however, affect admissibility of evidence obtained outside of the discovery process of the case in which cutoff is ordered.") (citations omitted).

[39] FED. R. EVID. 403.

may exclude the disputed evidence.[40]   Unfair prejudice is not satisfied by evidence that is "merely adverse to the opposing party."[41]   For that reason, district courts should apply Rule 403 sparingly.[42]   Rule 403's "major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."[43]   Rule 403 is not designed to "even out" the weight of the evidence.[44]   Baker's post-accident quality of life was hotly disputed, and Baker's witnesses testified in detail regarding the allegedly severe post-accident limitations Baker faces, including the inability to count money, make change, or be in crowds.   The video's probative value contradicting these statements weighs heavily against a hypothetical juror's moral aversion to gambling.   The district court did not abuse its discretion by allowing the surveillance footage.

F

Baker challenges the district court's admission of two neurology reports during the cross-examination of his son, Baker, Jr.   These neurology reports composed one of  Baker's exhibits.   Baker, Jr., testified regarding his father's mental and physical condition.  Illinois Central attempted to rebut his testimony by reading from these reports and asking Baker, Jr., whether the reports were read correctly.   Among other findings, the reports suggested that Baker may have purposely performed poorly on various physical examinations. Baker argues that Baker, Jr., was not present during these examinations and lacked

---

[40] Id.

[41] Brazos River Auth. v. GE Ionics, 469 F.3d 416, 427 (5th Cir. 2006).

[42] United States v. McRae, 593 F.2d 700, 708 (5th Cir. 1979).

[43] Id.

[44] Id.

17

personal knowledge. Thus, Baker argues Rule 602[45] prevented his son from testifying as to the events the reports discussed.

Even if the reports were improperly used with this witness, which we do not resolve, their use did not prejudice Baker. Pre-trial, he had introduced these documents as his own exhibit. Baker cannot claim that the contents of reports he introduced prejudiced him.

*     *     *

We have reviewed the numerous errors Baker alleges, and we find none of his arguments persuasive. We therefore AFFIRM the district court.

---

[45] FED. R. EVID. 602.