**Opinion issued July 21, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-01068-CV

———————————

## DIAMOND OFFSHORE SERVICES LIMITED AND DIAMOND OFFSHORE SERVICES COMPANY, Appellants

## V.

## WILLIE DAVID WILLIAMS, Appellee

On Appeal from the 164th District Court
Harris County, Texas
Trial Court Case No. 2011-31922

## DISSENTING OPINION

I respectfully dissent, and I urge the Texas Supreme Court to take this case to establish the criteria for exclusion of a surveillance video in the Texas courts under Texas Rule of Civil Procedure 403, which governs the admissibility of

evidence whose probative value is allegedly substantially outweighed by the danger of unfair prejudice or needless cumulativeness.

In this case, the trial court refused to admit into evidence a surveillance video showing the plaintiff, Willie David Williams, performing multiple physical tasks while at the same time seeking recovery for total and permanent disability allegedly caused by an on-the-job injury at Diamond Offshore. The jury awarded Williams $8.5 million in damages. The panel majority affirms. Because I believe the trial court's suppression of this probative evidence was prejudicial to Diamond Offshore, caused an unfair trial, and probably caused the rendition of an improper judgment, I would hold that the trial court abused its discretion. I would reverse the judgment of the trial court and remand for a new trial.

**Background**

Williams, a long-time offshore rig worker, served as a mechanic on an offshore oil rig located off the coast of Egypt that was owned and operated by Diamond Offshore. On January 7, 2008, he worked for approximately thirty to forty minutes repairing a set of elevators on the rig before he injured his back. When his back pain continued unabated after returning home from the rig, Williams saw Dr. Patrick Barrett, an orthopedic surgeon.

An MRI performed in December 2005 as part of pre-employment screening had indicated that Williams had bulging discs and "[d]egenerative disc disease of

2

the lumbar spine" two years before his back injury on the Diamond Offshore rig. In addition, Williams informed Dr. Barrett that he had also injured his back on a rig in 2006 and that he had had ongoing back pain since that injury. Dr. Barrett ultimately performed two surgeries on Williams' back: a micro discectomy in April 2008 and a fusion surgery in February 2009. Williams contends that, as a result of his injury on the Diamond Offshore rig, he is totally disabled and unable to return to work.

Before trial, Diamond Offshore indicated its intent to offer into evidence a post-incident surveillance video of Williams taken by an investigator it had hired. The video, which was slightly over an hour long, contained footage of Williams working outside his home on three consecutive days in December 2012, nearly five years after his injury occurred at Diamond Offshore. The video depicted Williams performing such tasks as repairing a four-wheeler vehicle, operating a mini-excavator, and performing other activities involving bending and lifting.

Williams sought to exclude the video, arguing that the video lacked any impeachment value because he had never claimed that he could not do the tasks depicted in the video. He also argued that the prejudicial effect of the video outweighed any probative value that the video might have and that the video could not be admitted as substantive evidence because "such a minimal and random view

of plaintiff's life cannot possibly be a fair representation of his disabilities or abilities since his injury."

In response, Diamond Offshore argued that the video demonstrated Williams, "with evidence ease," "bending, stooping, reaching, and throwing as he manually picks up debris on his property and puts it in the back of a trailer. He gets back in his trailer, hauls it off. He's apparently disposing of stuff." It contended that the video was admissible both as impeachment evidence and as substantive evidence relevant to Williams' post-incident physical condition, which went to the heart of all of Williams' future damages claims.

The trial court agreed with Williams and excluded the surveillance video, informing the parties that Diamond Offshore could "keep [the video] in your reserve bank for impeachment, and that's it. So, if [Williams] opens the door, then we'll take a look at it." The trial court did not view the video either then or subsequently.

Diamond Offshore sought admission of the surveillance video on several occasions throughout trial, arguing that the testimony of Dr. Jose Rodriguez, an orthopedic surgeon who reviewed Williams' medical records but did not treat Williams, and the testimony of Williams himself concerning the activities that Williams could perform after the incident were both contradicted by the contents of the video and that Diamond Offshore should be allowed to impeach the

4

witnesses with the video. Williams, for example, testified that he could still perform activities such as bending over, sitting and standing for long periods of time, working on cars, and using his excavator, although he was limited in the amount of time that he could do each activity, that his "back hurts constantly," and that it hurt him to do the activities that he used to do before his injury. On each occasion on which Diamond Offshore sought to admit the surveillance video, the trial court refused to admit it without viewing it.

The jury ultimately apportioned 30% fault for Williams' injury and damages to Diamond Offshore, 60% fault to the vessel Ocean Lexington, and 10% fault to Williams. The jury's verdict included, among other amounts, awards of $3.4 million for future physical pain and mental anguish, $2.2 million in loss of future earning capacity, and $1.7 million in future physical impairment. After reducing the jury verdict by 10% due to the fault apportioned to Williams and after applying a nearly-$200,000 offset, the trial court entered judgment against Diamond Offshore in the amount of $8,512,068.

**Admission of Surveillance Video**

In its first issue, Diamond Offshore contends that the trial court erred in excluding the post-incident surveillance video of Williams that it proffered. I agree with Diamond Offshore that the trial court should have admitted the

surveillance video and that the court's failure to do so resulted in an unfair trial, probably caused the rendition of an improper judgment, and requires reversal.

## A. Standard of Review

Under the Texas Rules of Evidence, "[a]ll relevant evidence is admissible" unless otherwise provided by constitution, statute, or rule. TEX. R. EVID. 402, 61 TEX. B.J. 374, 377 (Tex. & Tex. Crim. App. 1998, amended 2015) (hereinafter, "TEX. R. EVID. 402").[1] "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401, 61 TEX. B.J. 374, 377 (Tex. & Tex. Crim. App. 1998, amended 2015). Here, video evidence showing Williams performing the types of activities he claims to have been permanently disabled from performing by his injury at Diamond Offshore is clearly highly relevant to the extent of the injury he claims to have suffered and the amount of damages appropriate to compensate him for his injuries suffered at Diamond Offshore.

Williams argues, however, that this evidence is inadmissible under Rule 403, which provides, in relevant part, that "[a]lthough relevant, evidence may be

---

[1] Effective April 1, 2015, the Texas Supreme Court adopted amendments to the Texas Rules of Evidence. 78 TEX. B.J. 42, 42 (Tex. 2015). The revisions to Rules of Evidence 401, 402, and 403 were stylistic and do not affect the substance of the rules. I cite the old rules, which were the versions in effect at the time of the trial in this case.

excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or by . . . needless presentation of cumulative evidence." TEX. R. EVID. 403, 61 TEX. B.J. 374, 377 (Tex. & Tex. Crim. App. 1998, amended 2015) (hereinafter, "TEX. R. EVID. 403"). Under Rule 403, a trial court has broad discretion to exclude evidence "if it creates undue prejudice, [if it] distracts the jury from the main issue or issues, if it consumes an undue amount of time, or if it unfairly surprises the proponent's adversary." *TCA Bldg. Co. v. Nw. Res. Co.*, 922 S.W.2d 629, 637 (Tex. App.—Waco 1996, writ denied); *Charter Med. Corp. v. Miller*, 605 S.W.2d 943, 953 (Tex. Civ. App.—Dallas 1980, writ ref'd n.r.e.).

Rule 403, by its plain wording, requires that the trial court conduct a balancing test "to determine whether or not the proffered evidence is admissible." *TCA Bldg. Co.*, 922 S.W.2d at 637; *John Deere Co. v. May*, 773 S.W.2d 369, 373 (Tex. App.—Waco 1989, writ denied). "[T]estimony is not inadmissible on the sole ground that it is 'prejudicial' because in our adversarial system, much of a proponent's evidence is legitimately intended to wound the opponent." *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam). Evidence is inadmissible under Rule 403 only if its probative value is "substantially outweighed by the danger of *unfair* prejudice." *See id.* (emphasis in original); *see also PPC Transp. v. Metcalf*, 254 S.W.3d 636, 643 (Tex. App.— Tyler 2008, no pet.) (holding that trial court abused its discretion in excluding

7

relevant, probative evidence when prejudicial effect of evidence did not substantially outweigh probative value).  Evidence is unfairly prejudicial if it has an "undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *Cook v. Sabio Oil & Gas, Inc.*, 972 S.W.2d 106, 111 (Tex. App.—Waco 1998, pet. denied); *see also Olivarez v. Doe*, 164 S.W.3d 427, 430 (Tex. App.—Tyler 2004, pet. denied) ("Evidence is unfairly prejudicial if it would tend to persuade a jury to determine an issue on an improper basis such as emotion or bias.").

The admission or exclusion of evidence "is committed to the trial court's sound discretion." *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). A trial court does not abuse its discretion simply because the appellate court would have ruled differently under the same circumstances. *See E.I. DuPont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).  However, a trial court does abuse its discretion when it acts without reference to any guiding rules or principles. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex. 1995).

For the exclusion of evidence to constitute reversible error, the complaining party must demonstrate: (1) that the trial court committed error and (2) that the error was reasonably calculated to, and probably did, cause rendition of an improper judgment. *See Hahn v. Love*, 394 S.W.3d 14, 34 (Tex. App.—Houston [1st Dist] 2012, pet. denied).  "[A] successful challenge to evidentiary rulings

8

usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted." *Able*, 35 S.W.3d at 617. Thus, an appellate court generally does not reverse a judgment based on an erroneous ruling on admissibility when the evidence in question is cumulative and is not controlling on a material issue dispositive to the case. *Id.* In determining if the excluded evidence probably resulted in the rendition of an improper judgment, the appellate court reviews the entire record. *Id.*; *Hahn*, 394 S.W.3d at 35.

### B. Admission of Surveillance Videos

Although Texas courts have admitted post-accident surveillance videos offered by defendants to demonstrate the activities and capabilities of allegedly injured plaintiffs in personal injury cases, no Texas case has specifically addressed the criteria for the admissibility of surveillance videos under Rule 403. *See Huston v. United Parcel Serv., Inc.*, 434 S.W.3d 630, 642 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (considering post-accident surveillance video in factual sufficiency review of damages award where appellant plaintiff did not challenge admissibility of video on appeal); *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 424 (Tex. App.—Eastland 2006, no pet.) (upholding exclusion of six-second portion of surveillance video in which plaintiff made obscene gesture where appellant did not challenge trial court's admission of remainder of video); *Dunn v. Bank-Tec S.*, 134 S.W.3d 315, 329 & n.7 (Tex. App.—Amarillo 2003, no pet.)

9

(addressing whether surveillance video had been properly authenticated and stating that appellants had waived any argument that prejudicial effect of video substantially outweighed video's probative value); *Home Ins. Co. v. Garcia*, 74 S.W.3d 52, 56–57 (Tex. App.—El Paso 2002, no pet.) (considering surveillance video in factual sufficiency review where plaintiff did not challenge admissibility of video).

Federal courts and other state jurisdictions *have*, however, addressed the exclusion of surveillance videos showing a personal injury plaintiff performing tasks while also claiming damages for disability under circumstances virtually identical to those in this case. In my view, the analysis employed by those courts is applicable here and determinative of this case under the balancing test set out in Rule 403 and employed by Texas courts to determine unfairly prejudicial evidence. I would hold that the trial court improperly excluded the surveillance video under Rule 403 and, thereby, abused its discretion, resulting in reversible error.

### 1. Admissibility of surveillance videos as substantive, probative evidence

Williams argues that the surveillance video was not admissible because it was not substantive evidence, lacked impeachment value, and was more prejudicial than probative. I disagree with all of these objections. I would follow the courts in other jurisdictions that have weighed the prejudicial effect of a surveillance video vis-à-vis its probative value in order to determine its admissibility under Rule 403.

In *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513 (5th Cir. 1993), for example, the Fifth Circuit Court of Appeals considered whether a post-accident surveillance video constituted substantive evidence in addition to merely impeachment evidence in a personal-injury case. The Fifth Circuit defined "substantive evidence" as evidence that "is offered to establish the truth of a matter to be determined by the trier of fact." *Id.* at 517. The plaintiff, Chiasson, claimed that as a result of her injury she had suffered "great physical and mental pain and anguish," and she sought damages to "loss of enjoyment from the activities of her normal life." *Id.* The court noted that "the severity of [Chiasson's] pain and the extent to which she has lost the enjoyment of normal activity are among the key issues a jury must decide in calculating her damages." *Id.* Thus, it concluded that evidence that "would tend to prove or disprove such losses" should be considered "substantive" evidence. *Id.*

The court also observed that Chiasson had testified at trial that she was able to engage in her usual daily activities, but that she could not do so "for too long of a period of time" before she started to feel pain. *Id.* The court doubted whether the surveillance video at issue "discredits her testimony at all," but it still ultimately held that, not only did the video constitute substantive evidence, instead of merely impeachment evidence, but that the importance of the video was "obvious." *Id.* at 517–18. The Fifth Circuit remanded the case for a new trial,

11

ruling that because the video was "at the very least in part substantive," it should have been disclosed to Chiasson prior to trial and that the trial court abused its discretion in admitting the video without requiring Zapata Gulf to disclose it to Chiasson.[2] *Id.*

The Fifth Circuit affirmed its *Chiasson* reasoning in *Baker v. Canadian National/Illinois Central Railroad*, 536 F.3d 357, 369 (5th Cir. 2008), in holding that the trial court did not abuse its discretion by admitting a surveillance video the plaintiff had objected to as unfairly prejudicial. Baker alleged that his injuries and post-accident limitations included "the inability to count money, make change, or be in crowds." *Id.* Illinois Central offered a surveillance video that depicted Baker "spending long periods of time in casinos." *Id.* Baker argued, among other things, that the video should be excluded as unfairly prejudicial because it "informed jurors that he engaged in activities many people consider immoral." *Id.* The Fifth Circuit held, however, pursuant to *Chiasson*, that this video constituted substantive evidence. *Id.* The court also noted that the issue of Baker's "post-accident quality of life was hotly disputed" and that Baker's witnesses "testified in detail regarding the allegedly severe post-accident limitations Baker face[d]." *Id.* The court

---

[2]  *Chiasson* involved a local rule of the Eastern District of Louisiana which generally required parties to list the exhibits to be presented at trial. *See Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 515 (5th Cir. 1993). The question before the Fifth Circuit was whether the surveillance video was solely impeachment evidence or whether it was also substantive evidence, which would have required it to be disclosed to Chiasson before trial. *Id.* at 514.

12

ultimately concluded that the probative value of the video that contradicted Baker's witnesses "weighs heavily" against the prejudicial effect of "a hypothetical juror's moral aversion to gambling." *Id.* The court held that the trial court did not abuse its discretion by admitting the surveillance video. *Id.*

In circumstances almost identical to those in this case, the Mississippi Supreme Court likewise addressed whether the trial court abused its discretion in excluding a post-accident surveillance video of the plaintiff, who had injured her back, riding rollercoasters at a Six Flags amusement park. *James v. Carawan*, 995 So. 2d 69, 75–78 (Miss. 2008). In concluding that the trial court abused its discretion in excluding the video, the court noted that "[a] reasonable juror could conclude that the Six Flags video casts doubt on the severity of Carawan's injuries," that "a reasonable juror might conclude that the Six Flags video has a tendency to show that Carawan may not have been as weakened or vulnerable as she indicated to her doctors or as her medical treatments suggest," that "[t]he video also could have been relevant to whether or not she truly had been unable to work," that the video was relevant to the question of appropriate damages for pain and suffering, and that "this video might shed doubt upon the merits of Carawan's case as a whole." *Id.* at 76. The court concluded,

> We already have determined that the video was relevant. Aside from its damaging effect to Carawan's case, we are unable to determine how its admission would unfairly prejudice Carawan. A reasonable juror could understand that the video calls into question the severity of

13

Carawan's injuries prior to July 29, 2003, and therefore challenged the necessity of at least some of her medical expenses, the validity of her lost wages, the extent of her pain and suffering, and the legitimacy of her entire claim.

*Id.* at 77–78. In this case, this Court, like the trial court in *James*, reaches exactly the opposite conclusion on almost identical facts.

Here, Williams sought damages for, among other things, future pain and mental anguish, loss of future earning capacity, and future physical impairment, which implicated "loss of enjoyment of life." *See Doctor v. Pardue*, 186 S.W.3d 4, 18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (stating that jury may consider "loss of enjoyment of life" as factor in assessing damages for physical impairment). To support his contention that a proper award for lost future earning capacity equaled over $2.2 million, he presented testimony that he would be unable to work in any capacity in the future due to his physical limitations and his chronic pain caused by his injury while repairing elevators at Diamond Offshore for thirty to forty-five minutes. During his testimony, Williams acknowledged that he could perform the activities depicted in the surveillance video, although he emphasized that he could only engage in these activities for short periods of time before he felt pain and that he would be in pain later after engaging in these activities. Williams' friends and family members testified to essentially the same facts.

Admission of the surveillance video depicting Williams performing various activities outside his house over three consecutive days in December 2012,

14

including using his excavator to haul away scrap materials and repairing a vehicle, would have allowed the jury to judge for itself the credibility of Williams' and his friends and family members' testimony and to determine upon a fuller basis "the necessity of at least some of [his] medical expenses, the validity of [his] lost wages, the extent of [his] pain and suffering, and the legitimacy of [his] entire claim." *See James*, 995 So. 2d at 78. I would conclude that it was thus highly probative.

Moreover, like the Mississippi Supreme Court in *James*, I am unable to determine in this case how the admission into evidence of a surveillance video that "calls into question the severity of [Williams'] injuries . . . and therefore challenge[s] the necessity of at least some of [his] medical expenses, the validity of [his] lost wages, the extent of [his] pain and suffering, and the legitimacy of [his] entire claim" would have unfairly prejudiced Williams. *See id.* In my view, the surveillance video in this case legitimately calls into question the extent and severity of Williams' injuries, the extent to which he can still engage in activities that he enjoys, the extent to which he can still work, the degree to which he has lost "enjoyment of life," and the overall legitimacy of his claim for future damages. There is no prejudicial effect from the surveillance video other than the video's direct contradiction of Williams' and his experts' testimony that Williams cannot perform the tasks of a mechanic due to his work-related injury. Thus, any

15

prejudice to Williams' claim arises from the probative value of the video, not from the tendency of the video to evoke an improper emotional or biased response from the jury. *See Olivarez*, 164 S.W.3d at 430; *Cook*, 972 S.W.2d at 111. The video is both maximally probative and minimally prejudicial. *See James*, 995 So. 2d at 78.

These are not the only cases in which courts have performed the same balancing test under Rule 403 that the trial court failed to perform in this case and that consequently have found a surveillance video admissible. *See, e.g.*, *Zegarelli v. Hughes*, 814 N.E.2d 795, 798 (N.Y. 2004) (holding that trial court committed reversible error in excluding post-accident videotape of injured plaintiff shoveling snow after plaintiff testified that he took "two or three swipes" of parking area with shovel); *Sweet v. Pace Membership Warehouse, Inc.*, 795 A.2d 524, 528 (R.I. 2002) (reversing trial court's decision to exclude post-accident surveillance video and directing trial court, on remand, to evaluate admissibility of video under Rule 403).

Like the foregoing courts, I would conclude that admitting the surveillance video would have had no prejudicial effect "[a]side from its damaging effect to [Williams'] case." *James*, 995 So. 2d at 78. Therefore, I would conclude that the prejudicial effect of the video does not substantially outweigh the video's probative value; that the video is clearly admissible, relevant evidence under Rule 402, and the trial court erred in excluding it. *See* TEX. R. EVID. 402 ("All relevant evidence

16

is admissible, except as otherwise provided by Constitution, by statute, by these rules, or by other rules prescribed pursuant to statutory authority."); TEX. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). Yet neither the trial court nor the majority performed the balancing test required by Rule 403 and applied by these courts in other jurisdictions to determine the admissibility of surveillance videos and by courts in this jurisdiction generally to determine the admissibility of evidence objected to on Rule 403 grounds. *See Baker*, 536 F.3d at 369; *Chiasson*, 988 F.2d at 517–18; *James*, 995 So. 2d at 76; *cf. Bay Area Healthcare Grp.*, 239 S.W.3d at 234; *PPC Transp.*, 254 S.W.3d at 643; *TCA Bldg. Co.*, 922 S.W.2d at 637.

I agree not only with the judgment of the previous courts that have addressed the issue of the admissibility of surveillance videos, and with the Texas courts that have addressed the mandate of Rule 403, but also with the courts' holding that a trial court is required to perform a balancing test to determine whether a surveillance video is unfairly prejudicial and therefore subject to exclusion under Rule 403; and I would hold, like those courts, that a trial court that excludes relevant and material evidence without performing this test and making a rational determination that the evidence is unfairly prejudicial abuses its discretion. *See, e.g.*, *PPC Transp.*, 254 S.W.3d at 643.

17

I therefore deeply disagree with the majority's conclusion that a trial court has absolute discretion to rule a video inadmissible without viewing it or weighing its tendency to persuade a jury on an improper basis such as emotion or bias. *See Olivarez*, 164 S.W.3d at 430; *Cook*, 972 S.W.2d at 111. The majority merely assumes limitless discretion on the part of the trial court and this appellate court itself to make their own subjective determinations as to whether clearly material surveillance video evidence is admissible without performing the balancing test required by Rule 403 and without even viewing the video. In my view, this is error.

In support of his argument, Williams cites cases from other jurisdictions holding that a trial court did not abuse its discretion in excluding post-accident surveillance videos. Tellingly, however, in none of these cases did the appellate court ignore the requirements of Rule 403 in determining the admissibility of the surveillance video. Rather, like the preceding cases, and unlike the majority opinion in this case, Williams' cases all demonstrate that the appellate court *did* perform the balancing test required by Rule 403 to determine whether the trial court abused its discretion in applying that rule but excluded the surveillance video for other reasons, such as the unreliability of the evidence or its failure to show what the defendant claimed it showed.

For example, in one case from Illinois, the appellate court focused on the fact that the surveillance videotapes were edited and only showed the plaintiff outside, thus, in its view, "giv[ing] the impression that [the] plaintiff's activity is constant," and the fact that the plaintiff "can sustain labor-intensive activities over a period of time without rest or without experiencing pain," and it concluded that the danger of unfair prejudice outweighed the probative value of the surveillance videos. *See Carroll v. Preston Trucking Co.*, 812 N.E.2d 431, 435–36 (Ill. App. Ct. 2004); *see also Donnellan v. First Student, Inc.*, 891 N.E.2d 463, 478 (Ill. App. Ct. 2008) (relying on *Carroll* to uphold exclusion of surveillance video and stating, "Despite defendant's contention that [the videographer] testified that the video was not edited to demonstrate only the period plaintiff was working and that he filmed every moment that he could, the video leaves the impression that plaintiff was working for extended periods of time").

Williams also cites *Quinn v. Wal-Mart Stores, Inc.*, 774 So. 2d 1093 (La. Ct. App. 2000), in which the Louisiana appellate court concluded that the trial court had properly excluded a post-accident surveillance video when the injured plaintiff testified that she could perform the activities depicted in the video and the video did "not fairly indicate whether [the plaintiff] did experience pain after engaging in these activities." *Id*. at 1098. The court stated that "showing these tapes to the jury without context or explanation" could "create a prejudicial impression on the jury

that outweighs any probative value they may have to impeach [the plaintiff's] testimony." *Id.*

Likewise, in this case, Williams contends that the prejudicial effect of the "heavily edited" video substantially outweighs any probative value, citing *Carroll*, *Donnellan*, and *Quinn* as support for this contention. He argues that the video "paints a misleading picture of [his] condition" by not giving "fair representation of the fact that Williams could do [the activities depicted in the video] only for short stretches, of the pain medication he needed, or of the suffering he endured later."

Williams' concerns regarding unfair prejudice, however, are misplaced. His contention that the surveillance video, which contains footage from multiple days edited together onto one video, gives the impression that he was engaged in continual activity could easily have been dispelled by cross-examining the videographer, if he or she was the sponsoring witness, regarding the length of time the videographer filmed the plaintiff, where edits or cuts in the video were made, and whether and for how long the plaintiff engaged in activity outside the view of the camera. Indeed, Diamond Offshore had its videographer, Don Soutillo, available to testify, and, had the trial court admitted the surveillance video, Williams would have had the opportunity to cross-examine Soutillo concerning the circumstances under which the video was made. Moreover, the video plainly

20

showed, via time and date-stamps, the exact period of time over which Williams was shown performing the activities he claims he could not perform without pain and difficulty. Williams himself could have addressed the issues of whether he needed pain medication after engaging in the activities depicted in the surveillance video and whether he suffered pain as a result of participating in the activities depicted. Thus, any potential prejudicial effect from showing an edited video could have been minimized.

It is especially hard to see under these circumstances, including the potential for cross-examination, how Williams would have been *unfairly* prejudiced if the jury had been allowed to see the surveillance video. And the mere fact that the video was prejudicial to Williams' account of his permanent disability was not, by itself, grounds for exclusion, for, as the Texas Supreme Court stated in *Bay Area Healthcare Group*, "[T]estimony is not inadmissible on the sole ground that it is 'prejudicial' because in our adversarial system, much of a proponent's evidence is legitimately intended to wound the opponent." 239 S.W.3d at 234.

I would adopt the Fifth Circuit's reasoning in *Chiasson* and *Baker* and the Mississippi Supreme Court's reasoning in *James*, as well as the reasoning of the Texas courts that have construed Rule 403, and I would hold that the post-accident surveillance video proffered by Diamond Offshore constitutes substantive evidence relevant to the ultimate issues in this case—the amount of damages to which

Williams is entitled—and that its probative value substantially outweighed any prejudicial effect it might have had on the evidence in this case, and certainly any *unfair* prejudicial effect. *See Baker*, 536 F.3d at 369; *Chiasson*, 988 F.2d at 517 (holding that post-accident surveillance video, in addition to having impeachment value, is also "at the very least in part substantive" evidence); *James*, 995 So. 2d at 77; *see also Bay Area Healthcare Grp.*, 239 S.W.3d at 234; *PPC Transp.*, 254 S.W.3d at 643. Thus, it was error to exclude it.

The error was compounded by the trial court's failure even to view the video, much less to subject it to the balancing required by Rule 403. *See Bay Area Healthcare Grp.*, 239 S.W.3d at 234; *PPC Transp.*, 254 S.W.3d at 643; *TCA Bldg. Co.*, 922 S.W.3d at 637; *see also Baker,* 536 F.3d at 369; *James*, 995 So. 2d at 76. In my view, the trial court's decision to exclude the video can only have been made without reference to any guiding rules or principles, and its exclusion was, therefore, an abuse of discretion. *See Alvarado*, 897 S.W.3d at ;754.

### 2. *Authentication of video*

Williams also argues, however, that the trial court's ruling excluding the surveillance video can be upheld because Diamond Offshore did not establish the authenticity of the video. I find this argument likewise unavailing.

Authentication concerns whether the item of evidence in question "is what its proponent claims." *See* TEX. R. EVID. 901(a), 61 TEX. B.J. 374, 397 (Tex. &

22

Tex. Crim. App. 1998, amended 2015) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."); *Dunn*, 134 S.W.3d at 329 ("[T]he admissibility of a video is conditioned upon its identification by a witness as an accurate portrayal of the facts, and on verification by that witness or a person with knowledge that the photograph is a correct representation of such facts."). In *Dunn*, the Amarillo Court of Appeals held that the plaintiff could authenticate a surveillance video introduced during his cross-examination by agreeing that he was the person filmed and by "describ[ing] the things he was doing in [the video]." *Id.* at 329. The court concluded that Dunn's testimony "effectively supplied the predicate for the video's admission by revealing that its content was an accurate portrayal of the acts he was doing" and affirmed admission of the video. *Id.*

Here, Williams agreed, both in a pre-trial written brief and at a pre-trial hearing, that the proffered video depicted him performing various outdoor activities. He argued that the trial court ought to exclude the video *not* on authentication grounds but (1) because he would testify that he could do the activities depicted in the video, albeit for short periods of time only and that he would be in pain later, and thus the video did not constitute proper impeachment evidence, and (2) because the video did not fairly depict his post-injury abilities in

that it did not show that he needed rest and it did not reflect his pain. In making these arguments to support exclusion of the surveillance video, Williams conceded that he was the person depicted in the video and that the video accurately portrayed the acts that he was doing, although he argued that the way in which the video depicted these acts was "misleading," thus "effectively supply[ing] the predicate for the video's admission by revealing that its content was an accurate portrayal of the acts he was doing." *See Dunn*, 134 S.W.3d at 329.

I would conclude, therefore, that the trial court's ruling excluding the video cannot be supported on authenticity grounds. *See* TEX. R. EVID. 901(a).

### 3. Cumulative effect of video

Lastly, Williams argues that the trial court appropriately excluded the video because it was cumulative of his testimony that he could perform the acts depicted in the video. *See* TEX. R. EVID. 403.

Rule 403 allows trial courts to exclude relevant evidence if its probative value is substantially outweighed by a danger of "needless presentation of cumulative evidence." *Id.* However, as Diamond Offshore points out, the Texas Supreme Court has recently noted, in a spoliation of evidence context, the "differences in kind and quality between" evidence such as testimony and visual evidence, such as a surveillance video. *See Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 22 (Tex. 2014). The court observed that

24

> [A] spoliating party might argue that no prejudice resulted from spoliation of a video of an incident because there is also eyewitness testimony regarding the incident. But many of the inherent problems with such testimony—inaccurate memory, poor eyesight, bias, etc.— are simply not present with a video recording. Again, a picture is often worth a thousand words.

*Id.*; *see also In re K.Y.*, 273 S.W.3d 703, 710 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("[V]isual evidence has significant probative value apart from testimonial evidence on the same subject.").

There is a qualitative difference between Williams' testimony at trial that he could perform activities for a short period of time, but that it hurt him to do so, and a video recording of Williams performing the same activities unaware that he is being filmed and with no incentive to exaggerate the extent of his injuries. Thus, the video is not cumulative. Without the video there is nothing to show that Williams could, in fact, perform the tasks the video showed him performing, and how he performed those tasks, placing squarely before the sight of the jury the credibility of Williams' testimony that he could perform these tasks only with pain and difficulty. Thus, the surveillance video is not merely duplicative of other testimony but highly probative with respect to the extent of Williams' injury at Diamond Offshore to rebut interested testimony favorable to Williams' case.

I would conclude that the surveillance video proffered by Diamond Offshore was not cumulative of Williams' testimony. Instead, it had significant probative

25

value apart from any testimonial evidence on the same subject. *See Brookshire Bros*., 438 S.W.3d at 22; *In re K.Y.*, 273 S.W.3d at 710.

### *4. Harm analysis*

For the foregoing reasons, I would hold that the trial court erred in excluding the proffered surveillance video from the evidence, and I would turn to whether the exclusion of the surveillance video constituted reversible error. *See Hahn*, 394 S.W.3d at 34 (stating that, to constitute reversible error, appellant must demonstrate that error was reasonably calculated to, and probably did, cause rendition of improper judgment). I would hold that it probably did.

As stated above, Williams sought damages for, among other things, future pain and mental anguish, loss of future earning capacity, and future physical impairment. Williams presented testimony from a number of witnesses that he could no longer be employed in any job, even one that involved light or sedentary work, due to his chronic pain and physical limitations. He presented testimony that he could no longer do the activities that he used to enjoy to the extent that he could before his injury due to his chronic pain from his injury; and he testified that, when he did engage in those activities, he could do so only for a short period of time and that it hurt him to do so. He testified that, after the injury, he could no longer enjoy life the way he used to do. The jury credited this evidence and awarded Williams, a long-time offshore rig worker who had a history of degenerative changes in his

26

back, just over $8.5 million in damages, including $3.4 million in future physical pain and mental anguish, $2,254,275 in loss of future earning capacity, and $1.7 million in future physical impairment.

The proffered surveillance video goes to the heart of each of Williams' damages questions. The video depicts Williams using his excavator, picking up debris and scrap materials, picking up large tires, repairing vehicles, and bending and stooping to perform these activities. The video thus calls into question his experts' contentions that he could not perform any of the work of a mechanic after his injury at Diamond Offshore and that he cannot perform any work in the future due to his chronic pain. The video also casts doubts on the extent of Williams' pain and the degree to which his injury has affected his ability to enjoy life, in that it would have enabled the jury to observe Williams as he performed these activities, implicating the future physical impairment award.

Because the trial court failed even to view the surveillance video or to perform the balancing test required by Rule 403, and thus excluded it arbitrarily and without reference to any guiding rules of principles, and because it was highly probative and not unfairly prejudicial, and therefore clearly admissible under the plain language of Rule 403 and controlling and persuasive authority, I would hold that the trial court clearly abused its discretion in excluding the surveillance video from evidence.

27

I would also conclude, based on the foregoing facts and law, that Diamond Offshore has established that the exclusion of the surveillance video was "reasonably calculated to, and probably did, cause the rendition of an improper judgment." *Hahn*, 394 S.W.3d at 34; *see also James*, 995 So. 2d at 78 (holding that exclusion of surveillance video affected defendant's "substantial right to present his defense" and thus constituted reversible error). I would therefore hold that the trial court committed reversible error when it excluded Diamond Offshore's proffered surveillance video.

I would sustain Diamond Offshore's first issue.

## Conclusion

I would reverse the judgment of the trial court and remand the case for a new trial.

Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Justice Keyes, dissenting.